By the Court.
 

 Take a rule to show cause on Monday next, at nine o’clock in the morning.
 

 *The defendant appearing on Monday the 14th, agreeable to rule r*,^ to show cause, obtained on Saturday, prayed that the rule might be *- enlarged, as he had not had a reasonable time to prepare for the argument. But
 
 JLewis
 
 opposed the enlargement of the rule, observing, that the defendant would be heard in extenuation or excuse of the contempt, after the attachment had issued.
 

 By McKean, C. J. — I know not of any instance where a delay of a term has been allowed, in the case of an attachment : one reason for such a summary proceeding is to prevent delay. Let cause be now shown.
 

 Sergeant,
 
 in showing cause against the attachment; contended, that the doctrine in 4 Black. Com. 280, was laid down much too wide; that in 2 Atk. 469, the chancellor expressly assigns this reason for his determining without a jury, that he was a judge of fact; and in 1 Burr. 510, 513, an information is granted on this principle, that courts of common law will not decide upon facts, without the intervention of a jury.
 

 McKean, C. J. — This was not the reason that influenced the court in their decision.
 

 But, whatever the law might be in England,
 
 Sergeant
 
 insisted, that it could not avail in Pennsylvania. Even in England, indeed, though it is said to be a contempt, to report the decisions of the courts, unless under the
 
 imprimatur
 
 of the judges ; yet, we find Burrow, and all the subsequent reporters, proceeding without that sanction. But the constitution of Pennsylvania authorizes many things to be done, which in England are prohibited. Here, the press is laid open to the inspection of every citizen, who wishes to examine the proceedings of the government ; of which the judicial authority is certainly to be considered as a branch. Const. Penn. § 35.
 

 McKean, C. J. — Could not this be done in England ? Certainly it could; for, in short, there is nothing in the constitution of this state, respecting the liberty of the press, that has not been authorised by the constitution of that kingdom for near a century past.
 

 Sergeant.
 
 — The 9th section of the bill of rights, however, puts this supposed offence into such, a form, as must entitle the defendant to a trial by jury ; and precludes every attempt to compel him to give evidence against himself. It declares, “ that, in all prosecutions for criminal offences, a mar has a right to be heard by himself and his counsel, to demand the cause and nature of his accusation, to be confronted with the witnesses, to call for evidence in his favor, and a speedy public trial, by an impartial jury of the country, without the unanimous consent of which jury, he cannot be found guilty ; nor can he be compelled to give evidence against himself ; nor can any man be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers.” Now, the present proceeding against the de
 
 *338
 
 fendant, is for a criminal offence ; and, yet, if the attachment issues, the esssential parts of this section must be defeated : for, in that case, the de*3231 ^enc^ant °annot be tried by a jury ; and, according *to the practice J upon attachments, he will be compelled to answer interrogatories ; in doing which, he must either be guilty of perjury, or give evidence against himself. The proceeding by attachment is, indeed, a novelty in this country, except for the purpose of enforcing the attendance of witnesses. Those con-tempts which are committed in the face of a court, stand upon a very different ground. Even the court of admiralty (which is not a court of record) possesses a power to punish them ; and the reason arises from the necessity that every jurisdiction should be competent to protect itself from immediate violence and interruption. But contempts which are alleged to have been committed out of doors, are not within this reason; they come properly within the class of criminal offences ; and, as such, by the 9th sect, of the bill of rights, they can only be tried by a jury.
 

 McKean, C. J. — Do you then apprehend that the 9th. sect, of the bill of rights introduced something new on the subject of trials ? I have always understood it to be the law, independent of this section, that the twelve jurors must be unanimous in their verdict, and yet this section makes this express provision.
 

 Sergeant
 
 said, that he had discussed the subject as well as the little opportunity afforded, him would admit. He pressed the court to give further time for the argument, or, at once, to direct a trial. This he contended was, at least, discretionary ; and, considering the defendant’s protestation of innocence,
 

 (a)
 

 liis readiness to give ample security for his future appearance, the magnitude of the question as arising from the constitution, and its immense consequences to the public, he thought a delay, that was essential to deliberation and justice, ought not to be refused.
 

 Heatly
 
 and
 
 Lewis,
 
 in support of the motion, contended, that under the circumstances of the case, Oswald’s publication, whether true or false, amounted to a contempt of the court, as it respected a cause then depending in judgment, and reflected upon one of the judges in his official capacity ; that the argument of the adverse counsel went so far as to assert, there could be no such offence as a
 
 contempt, even in
 
 England, since the very words inserted in the constitution of Pennsylvania, were used in the
 
 Magna Charta
 
 of that kingdom ; that, in truth, neither the bill of rights nor the constitution extended to the case of contempts, for they mean only to secure to every citizen the right of exjn’essing his sentiments with a manly freedom, but not to authorize wanton attacks upon private reputation, or to deprive the court of a power essential to its own existence, and to the due administration of justice ; that the court were as competent to judge of the fact and the law, upon the inspection of the publication in question, as the chancellor was, in the authority cited from Atkins ; and that although the prosecutor could, perhaps, proceed either by indictment or information, yet # -. that the abuses of the Star Chamber had rendered the process by infor12 J malion *odious, and an attachment, which was sanctified by im-
 
 *339
 
 inemoa ial usage, was the most expeditious, and therefore, the most proper remedy for the evil complaint of.
 

 The Chief Justice delivered the opinion of the court to the following effect — Judge Bryan having shortly before taken his seat.
 

 McKean, C. J. — This is a motion for an attachment against Eleazer Oswald, the printer and publisher of the Independent Gazetteer, of the 1st of July last, No. 796. As a ground for granting the attachment, it is proved, that an action for a libel had been instituted in this court, in which Andrew Browne is the plaintiff, and Eleazer Oswald the defendant; 'that a question with respect to bail in that action, had been agitated before one of the judges, from whose order, discharging the defendant .on common bail, the plaintiff had appealed to the court; and that Mr. Oswald’s address to the public, which is the immediate subject of complaint, relates to the action thus depending before us.
 

 The counsel in support of their motion, have argued, that this address was intended to prejudice the public mind upon the merits of the cause, by propagating an opinion that Browne was the instrument of a party to persecute and destroy the defendant ; that he acted under the particular influence of Dr. Rush, whose brother is a judge of this court; and, in short, that from the ancient prejudices of all the judges, the defendant did not stand a chance of a fair trial.
 

 Assertions and imputations of this kind are certainly calculated to defeat and discredit the administration of justice. Let us, therefore, inquire, first, whether they ought to be considered as a contempt of the court; and, secondly, whether, if so, the’offender is punishable by attachment.
 

 And here, I must be allowed to observe, that libelling is a great crime, whatever sentiments may be entertained by those who live by it. With respect to the heart of the libeller, it is more dark and base than that of the assassin, or than his who commits a midnight arson. It is true, that I may never discover the wretch who has burned my house, or set lire to my barn ; but these losses are easily repaired, and bring with them no portion of ignominy or reproach. But the attacks of the libeller admit not of this consolation : the injuries which are done to character and reputation seldom can be cured, and the most innocent man may, in a moment, be deprived of his good name, upon which, perhaps, he depends for all the prosperity, and all the happiness of his life. To what tribunal can he then resort ? how shall he be tried, and by whom shall he be acquitted ? It is in vain to object, those who know him will disregard the slander, since the wide circulation of public prints must render it impracticable to apply the antidote so far as the poison has been extended. Nor can it be fairly said, that the same opportunity is given to vindicate, which has been employed to defame him ; for, many will read the charge, who may never see the answer ; *and p while the object of accusation is publicly pointed at, the malicious L and malignant author rests in the dishonorable security of an anonymous signature. Where much has been said, something will be believed ; and it is one of the many artifices of the libeller, to give to his charges an aspect of general support, by changing and multiplying the style and name of his performances. But shall such things be transacted with impunity in a free
 
 *340
 
 country, and among an enlightened people ? Let every honest man make this appeal to his heart and understanding, and the answer must l e — no !
 

 What then is the meaning of the bill of rights, and constitution of Pennsylvania, when they declare, “ That the freedom of the press shall not be restrained,”
 
 (a)
 
 and “ that the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature,. or any part of the government ?”
 
 (b)
 
 However ingenuity may torture the expressions, there can be little doubt of the just sense of these sections; they give to every citizen a right of investigating the conduct of those who are intrusted with the public business; and they effectually preclude any attempt to fetter the press by the institution of a licenser. The same principles were settled in England, so far back as the reign of
 
 William III.,
 
 and since that time, we all know, there has been the freest animadversion upon the conduct of the ministers of that nation. But is there anything in the language of the constitution (much less in its spirit and intention) which authorizes one man to impute crimes to another, for which the law has provided the mode of trial, and the degree of punishment ? Can it be presumed, that the slanderous words, which, when spoken to a few individuals, would expose the speaker to punishment, become sacred, by the authority of the constitution, when delivered to the public through the more permanent and diffusive medium of the press ? Or, will it be said, that the constitutional right to examine the proceedings of government, extends to warrant an anticipation of the acts of the legislature, or the judgments of the court ? and not only to authorize a candid commentary upon what has been done, but to permit every endeavor to bias and intimidate with respect to matters still in suspense ? The futility of any attempt to establish a construction of this sort, must be obvious to every intelligent mind. The true liberty of the press is amply secured by permitting every man to publish his opinion; but it is due to the peace and dignity of society, to inquire into the motives of such publications, and to distinguish between those which are meant for use and reformation, and with an eye solely to the public good, and those which are intended merely to delude and defame. To the latter description, it is impossible that any good government should afford protection and impunity.
 

 If, then, the liberty of the press is regulated by any just principle, there can be little doubt, that he who attempts to raise a prejudice against Ms * antagonist, in the minds of those that must ultimately *determine the J dispute between them; who, for that purpose, represents himself as a persecuted man, and asserts that his judges are influenced by passion and prejudice — wilfully seeks to corrupt the source, and to dishonor the administration of justice.
 
 [1]
 

 Such is evidently the object and tendency of Mr. Oswald’s address to the public. Nor can that artifice prevail, which insinuates that the decision of this court will be the effect of personal resentment; for, if it could, every man could evade the punishment due to his offences, by first pouring a torrent of abuse upon his judges, and then asserting that they act from passion,
 
 *341
 
 because their treatment has been such as would naturally excite resentment in the human disposition. But it must be remembered, that judges discharge their functions under the solemn obligations of an oath; and, if their virtue entitles them to their station, they can neither be corrupted by favor
 
 to
 
 swerve from, nor influenced by fear to desert their duty. That judge, indeed, who courts popularity by unworthy means, while he weakens his pretensions, diminishes, likewise, the chance of attaining his object; and he will eventually find that he has sacrificed the substantial blessing of a good conscience, in an idle and visionary pursuit.
 

 Upon the whole, we consider the publication in question, as having the tendency which has been ascribed to it, that of prejudicing the public (a part of whom must hereafter be summoned as jurors), with respect to the merits of a cause depending in this court, and of corrupting the administration of justice ; we are, therefore, unanimously of opinion on the first point, that it amounts to a contempt.
 

 It only remains then to consider, whether the offense is punishable in the way that the present motion has proposed.
 

 It is certain, that the proceeding by attachment is as old as the law itself, and no act of the legislature, or section of the constitution, has interposed to alter or suspend it. Besides the sections which have been already read from the constitution, there is another section which declares, that “ trials by jury shall be as heretofore ;” and surely it cannot be contended, that the offence, with which the defendant is now charged, was heretofore tried by 1 hat
 
 tribunal.
 

 (a)
 

 If a man commits an outrage in the face of the coi:r', what is there to bo tried ? — what further evidence can be necessary to cor. vie. him of the offence, than the actual view of the judges ? A man 3 as lx e i compelled to enter into security for his good behavior, for giving the l o i.i the presence of tlic judges in Westminster Hall.
 

 On the present occasion, is not the proof, from the inspection of t!>. paper, as full and satisfactory as any that can be offered ? And whether the publication amounts to a contempt, or not, is a point of law, which, after all, it is the province of the judges, and not of the jury, to determine. Being a contempt, if it is not punished immediatly, how shall the mischief be corrected ? Leave it to the customary forms of a trial by jury, and the cause may be continued long in suspense, while the party perseveres in his misconduct. The ^'injurious consequences might then be justly imputed to the court, for refusing to exercise their legal power in preventing *- them.
 

 For these reasons, we have no doubt of the competency of our jurisdiction ; and, we think, that justice and propriety call upon us to proceed by attachment.
 

 Bryan, Justice, observed, that he did not mean to give an opinion as to
 
 *342
 
 the mode of proceeding ; but added, that he had always entertained a doubt with respect to the legality of the process by attachment, in such cases, un> der the constitution of Pennsylvania.
 

 McKean, C. J. — Will the defendant enter into a recognisance to answei interrogatories, or will he answer
 
 gratis f
 

 Oswald.
 
 — I will not answer interrogatories. Let the attachment issue,
 
 (a)
 

 McKean, C. J. — His counsel had better advise him to consider of it.
 

 Sergeant
 
 said, that the defendant had not had time, even to peruse what had been sworn against him ; for only Sunday had intervened since the obtaining the rule to show cause, and that was an improper day for applying to the records of the court.
 

 McKean, C, J. — In criminal matters, Sunday has always been deemed a legal day.
 
 [1]
 
 There has been as ample time for consideration as could well be allowed ; the term will end to-morrow. Will he answer, or not ?
 

 Sergeant
 
 prayed the court would grant until to-morrow morning to form a determination on the subject, and offered bail for the defendant’s appearance at that time.
 

 McKean, C. J. — -Be it so. Let the bail be taken, himself in 200?., and one surety in the like sum, for his appearance to-morrow morning.
 

 The defendant appearing on the 15th of July, in discharge of his recog-nisance ; the Chief Justice again asked, whether he would answer interrogatories or not ?
 

 JBanleson, for the defendant, requested, that the interrogatories might- be reduced to writing, before he was called upon to determine.
 

 McKean, C. J. — Is that your advice to him ? He must now say, whether he will answer them or not; they will be filed according to the usage of the coui-t, and all just exceptions to them will be allowed.
 

 JBanleson.
 
 — He instructs me to declare that he will not answer interrogatories ; and he then began to urge, that there was no contempt committed, *328] but was told by the Chief Justice, that, as *that point had been determined by a unanimous opinion of the four judges yesterday, it was not now open for argument.
 
 [2]
 

 Lewis
 
 said, that as a misrepresentation had been industriously spread abroad respecting the conduct of the court, he thought it proper, at this time,
 
 *343
 
 concisely to state the real nature of the present proceedings. It has been asserted, that the court were about to compel Mr. Oswald to convict himself of the offence with which he is charged; but the fact is this, that it is incumbent upon the person who suggests the contempt, to prove it by disinterested witnesses ; and then, indeed, the defendant is allowed, by his own oath, to purge and acquit himself, in spite of all the testimony which car possibly be produced against him. It appears clearly, therefore, that Mr. Oswald’s being called upon to answer interrogatories, is not meant to establish his guilt (for that has been already done), but to enable him to avoid the punishment which is the consequence of it. The court employ no compulsion in this respect. He may either answer, or not, as he pleases ; if he does answer, his single oath, in his own favor, will countervail the oaths of a thousand witnesses; and if he does not answer, his silence corroborates the evidence which has been offered of the contempt, and the judgment of the court must necessarily follow,
 
 (a)
 

 McKean, C. J. — Your statement is certainly right; and the misrepresentation which is attempted, must either be the effect of wickedness or ignorance.
 

 Lewis
 
 now prayed, that the rule might be made absolute ; but remarked, that, according to the authorities, the court might either do that, or, as the defendant was present, they might proceed at once to pass sentence upon him.
 

 McKean, C. J. — There can be no occasion, when the party is present, to make the' rule for the attachment absolute : the. court will proceed to give judgment.
 

 Bryan, Justice. — I was not here when the complaint was made to the court, when the evidence in support of the motion was produced, or the arguments against it were delivered ; I consider myself, therefore, totally incapacitated for taking any part in this business.
 

 Lewis.
 
 — We can immediately furnish the court with the proofs.
 

 Bryan, Justice. — Can you furnish me, likewise, with Mr. Sergeant’s arguments.
 

 Lewis
 
 said, that he had not penetration enough to discover any argument in what had been said for the defendant; and having again read all the evidence which had been produced, he recapitulated what he had before said in support of the motion.
 

 Page,
 
 the Under-sheriff, was then called upon to prove, that the writ in the action of
 
 Browne
 
 v.
 
 Oswald
 
 had been in his possession, at least twelve days before it was served; and that the delay in serving it arose, at first, from the defendant’s being at Baltimore ; and afterwards, from his not being at home when the witness had repeatedly called upon him.
 

 *Bryan, Justice. — I still say, that not having heard what has been [-*309 offered in extenuation of the offence, I am incompetent to join in any *-
 
 *344
 
 opinion respecting the punishment. I cannot surely be suspected of partiality to libellers; I have had my share of their malevolence. But it is true, I have not suffered much; for these trifles do not rankle in my mind.
 

 The Chief Justice pronounced the judgment of the court in the following -words:—
 

 McKean, Chief Justice. — Eleazer Oswald: Having yesterday considered the charge against you, we were unanimously of opinion, that it amounted to a contempt of the court. Some doubts were suggested, whether, even a contempt of the court was punishable by attachment: but, not only my brethren and myself, but, likewise, all the judges of England, think, that without this power, no court could possibly exist- — -nay, that no contempt could, indeed, be committed against us, we should be so truly contemptible. The law upon the subject is of immemorial antiquity ; and there is not any period when it can be said to have ceased or discontinued. On this point, therefore, we entertain no doubt,
 
 (a)
 

 But some difficulty has arisen with respect to our sentence ; for, on the one hand, we have been informed of your circumstances, and on the other, we have seen your conduct; your circumstances are small, but your offence is great and persisted in. Since, however, the question seems to resolve itself into this, whether you shall bend to the law, or the law shall bend to you, it is our duty to determine that the former shall be the case.
 

 Upon the whole, therefore, the Court pronounce this sentence : — That you pay a fine of 10?. to the commonwealth ; that you be imprisoned for the space of one month, that is, from the 15th day of July to the 15th day of August next; and afterwards, until the fine and costs are paid. Sheriff, he is in your custody,
 

 (b)
 

 (a)
 

 Mr. Oswald repeatedly declared, that he meant no contempt of the court, in what he had published.
 

 (a)
 

 Declar. of Rights, § 12.
 

 (b)
 

 Const. of Penn, of 1776, § 35.
 

 [1]
 

 Sob Const. of 1874, art. I., § 7. Commonwealth
 
 v.
 
 Singerly, 38 Leg. Int. 177; Commonwealth
 
 v.
 
 Willard, 9 W. N. C. 524 Commonwealth
 
 v.
 
 Woodward, 7 Luz. L. Reg. 39, 44.
 

 (a)
 

 In Hollingsworth
 
 v.
 
 Duane (Wall. C. C. 77, 106), the circuit court of the United States held that a similar provision in the constitution of the United States did not de-' prive the courts of the right to punish contempts in a summary mode.
 
 [1]
 

 [1]
 

 And see United States
 
 v.
 
 Hudson, 7 Cr. 32; United States
 
 v.
 
 New Bedford Bridge, 1 W. A M. 401.
 

 (a)
 

 At this period of the cause, I am informed by a gentleman of great learning and accuracy, that the court called for the sheriff, in order to commit the defendant: but the transition from that idea to the advice which fell from the bench, must have been so in.stantaneous, that, if I heard that call, I presume, I did not consider it as a part of the proceedings, and therefore, omitted it in my notes. If it is of any importance,
 
 l
 
 am happy in the opportunity of supplying this defect.
 

 [1]
 

 Proceedings for contempt are criminal in their character. Durant
 
 v.
 
 Supervisors, 1 Wool. 377.
 

 [2]
 

 Wartman
 
 v.
 
 Wartman, Taney, Dec. 362.
 

 (a)
 

 See Hollingsworth v. Duane, Wall. C. C. 78.
 

 (a)
 

 In Respublica v. Passmore, 3 Yeates 438, it was held, that a publication, attempting to prejudice the public mind on the merits of a suit pending at court, was punishable by attachment; and the defendant in that case was sentenced to fine and imprisonment. The power of the courts to punish in a summary way, for what are called
 
 constructive
 
 contempts, has since been taken away by the act of 19th April 1809 (5 Sm. L. 55), which restricts their power of summary punishment, to cases of “ official misconduct of the officers of the courts, to the negligence or disobedience of officers, parties, jurors or witnesses, against the lawful process of tho court, and to the misbehavior of any person in the presence of tho court, obstructing the administration of justice.” The act, however, declares that publications tending to bias the public mind respecting any question depending in court, may be punished by indictment, or by a civil action.
 
 [1]
 

 (b)
 

 The sentence on the point of imprisonment, was entered upon tho record for the space of one month, without taking notice of the explanatory words used by tho court. At the expiration of the legal month (28 days), Mr. Oswald demanded his discharge; but with this, the sheriff, who had heard the sentence pronounced, refused to comply, unti' he had consulted the Chief Justice. His honor, remembering the meaning and words of the court, told this officer, at first, that he was bound to detain his prisoner until the morning of the 15th of August; but, having shortly afterwards examined the record, he wrote to the sheriff, that Mr. Oswald, agreeable to the entry there, was entitl sd to his discharge.
 

 On the 5th of September 1788, Mr. Oswald presented a memorial to the General As
 
 *345
 
 sembly, in which he stated the proceedings against him, complained of the deci don of three of the judges of the court, in the principal case, and of the direction of the Chief Justice to the sheriff, by which, he alleged, his confinement had afterwards been illegally protracted — finally calling upon the house to determine, “ whether the judges did not infringe the constitution in direct terms, in the sentence they had pronounced; and whether, of course, they had not made themselves proper objects of impeachment.”
 

 The assembly, having previously appointed a committee to report the order of proceeding on Mr. Oswald’s memorial, resolved itself into a committee of the whole, to hear the evidence in support of the charges exhibited. Three days were consumed in the examination of witnesses, during which, the above report was substantially proved, together with the subsequent transaction relative to Mr. Oswald’s imprisonment.
 

 Mr. Lewis, as a member of the house, then delivered a very elaborate argument, in vindication of the conduct of the judges; and, though this is, in some degree, foreign to my immediate undertaking, it may not be unprofitable to those, who, either now or hereafter, wish to understand the principles of so interesting a case, to delineate the leading features of the doctrine which he maintained.
 

 He began with stating the inestimable character of true liberty, which is equally endangered by tyranny on the one hand, and by licentiousness upon the other. Ho said, it did not consist in the uncontrolled power of doing whatever the will might prompt an individual to attempt; but, while it was independent of arbitrary and despotic rule, it was happily regulated by the laws and constitution of the state. Having rescued Sir William Blaekstone from the stigma of being a
 
 com'tty
 
 writer, by showing the enthusiasm of that author in favor of the trial by jury, Mr.
 
 Lewis
 
 referred to the celebrated Commentaries in support and illustration of his sentiments upon liberty. 1 Black. Com. 125; 2 Id.; 4 Id. 3, 42.
 

 He then commented upon the origin, nature and purposes of a state of society, which, he said, was principally formed to protect the rights of individuals; and of those rights, he pathetically described the right of enjoying a good name, to be the most important and most precious. He observed, that the injuries which could be done to any other property, might be repaired; but reputation was not only the most- valuable, but likewise the most delicate of human possessions. It was the most difficult to acquire ; when acquired, it was the most difficult to preserve; and when lost, it was never to be regained. If, therefore, it was not as much protected as any other right, the aged matron, and the youthful virgin (since purity of character is the palladium of female happiness), while they are fettered by the habits and expectations of society, are exposed and abandoned by its laws and institutions. But this evil is effectually removed, when we consider the bill of rights as precluding any attempt to restrain the press, and not as authorising insidious falsehoods and anonymous abuse. The right of publication, like every other right, has its natural and necessary boundary; for, though the law allows a man the free use of his arm, or the possession of a weapon, yet it does not authorise him to plunge a dagger in the breast of an inoffensive neighbor.
 

 Mr.
 
 Lewis
 
 then proceeded to consider the immediate subject of complaint. He stated it to be two-fold: 1st, That the Chief Justice had protracted Mr. Oswald’s imprisonment beyond the legal expiration of his sentence: and 2d, That the imprisonment itself was unconstitutional, illegal and tyrannical.
 

 On the first point, he observed, that it was, indeed, a serious charge, if Mr. Oswald could prove that a single justice had arbitrarily altered or counteracted the record of the court, in oi’der to accomplish the imprisonment of a citizen. But how was the charge supported ? The opinion given by the Chief Justice to the jailer, was not given in his judicial capacity; and though a paper, said to be a transcript from the recoi ds, was shown to him, yet it was not subscribed by the prothonotary, nor was it under the seal of the court. This, therefore, could not be a sufficient document to set aside his recollection of the sentence; it was no legal evidence of the fact which it stated (Gilb. Law of Ev. 23), and the little time that elapsed between the opinion given to the jailer, and the directions for Mr. Oswald’s release, we may fairly presume to have been consumed in examining the records.
 

 
 *346
 
 On the second point, he engaged in a long and ingenious disquisition upoi the nature of what is called the liberty of the press; he represented the shackles whicn had been imposed upon it during the arbitrary periods of the English government; and thence deduced 'he wisdom and propriety of the precaution, which declares, in the bill of rights, tkat the press shall not be subject to restraint. He gave an historical narrative of the British acts of parliament and proclamations, which debarred every man of the right of publication, without a previous license obtained from officers established by the government to inspectand pronounce upon every literary performance; but observed, that this oppression (which was intended to keep the people in a slavish ignorance of the conduct of their rulers) expired in the year 1694, when the dawn of true freedom rose upon that nation. 9 vol. Stat. at Large, p. 190. Since that memorable period, the liberty of the press has stood on a firm and rational basis. On the one hand, it is not subject to the tyranny of previous restraints, and on the other, it affords no sanction to ribaldry and slander — so true it is, that to censure the licentiousness, is to maintain the
 
 liberty
 
 of the press. 4 Black. Com. 150, 151, 152. Here, then, is to be discerned the genuine meaning of this section in the bill of rights, which an opposite construction would prostitute to the most ignoble purposes. Every man may publish what he pleases ; but it is at his peril, if he publishes anything which violates the rights of another, or interrupts the peace and order of society — as every man may keep poisons in his closet, but who will assert that he may vend them to the public for cordials ? If, indeed, this section of the bill of rights had not circumscribed the authority of the legislature, this house, being a single branch, might, in a despotic paroxysm, revive all the odious restraints which disgraced the early annals of the British government. Hence, arises the great fundamental advantage of the provision, which the authors of the constitution have wisely interwoven with our political system; not, it appears, to tolerate and indulge the passions and animosities of individuals, but effectually to protect the citizens from the encroachments ef men in power.
 

 It has been asserted, however, that Mr. Oswald’s address was of a harmless texture; that it was no abuse of the right of publication, to which, as a citizen, he was entitled; and, in short, that in considering it as a contempt of the court, the judges have acted tyrannically, illegally and unconstitutionally. But let us divest the subject of these high-sounding epithets, and the reverse of this assertion will be evident to every candid and unprejudiced mind: for such publications are certainly calculated to draw the adr ministration of justice from the proper tribunals ; and in their place to substitute newspaper altercations, in which the most skilful writer will generally prevail against all the merits of the case. But it is moreover the duty of the judges to protect suitors, not only from personal violence, but from insidious attempts to undermine their claims to law and justice. Hence, Lord Chancellor Hardwicke (who was an ornament to his country, and not one of whose decrees, during the period of twenty years which he sat as Chancellor, was ever reversed) has described three sorts of contempts — 1st, Scandalizing the court itself: 2d, Abusing parties who are concerned in causes there; and 3d, Prejudicing mankind'against persons, before the cause is heard. 2 Atk. 471. And in 2 Vesey 520, though no reflection was cast upon the court, and the offender pleaded ignorance of the law, yet, it is expressly laid down, that ignorance was not an excuse, and that the reason for punishing was, not only for the sake of the party injured, but also for the sake of the public proceedings in the court, to hinder such advertisements, which tend to prepossess people as to those proceedings. A similar doctrine is maintained in 1 P. Wms. 675. And 4 Black. Com. 282, pronounces the printing, even true accounts of a cause depending in judgment, to be a contempt of the court.
 

 But it has been said, that this cause was not depending in court, when the offence was committed, because the address was published on the first of July, and the writ against Mr. Oswald was not returnable until the succeeding day. This idea originates in an ignorance of the constitution of our courts, which, in this respect, differs essentially from the constitution of the courts of England. There, all original process issues out of tho court of Chancery, and is made returnable into the King’s Bench or Common Pleas; bo that, in truth, the writ gives the jurisdiction, and of course, until it is returned, the
 
 *347
 
 court cannot taxe cognisance of the cause. Here, however, the original process issues out of the very court into which it is returnable, and is usually tested the last day of the preceding term. It is absurd, therefore, to say that the jurisdiction of a court, by whose authority a suit is actually instituted, can be thus suspended and parcelled out.
 

 With respect to the address itself, Mr.
 
 Lewis
 
 analysed its offensive parts, in order to show that it treated the judges with indecent opprobrium; that, in some respects, it was inconsistent with truth, and that, in its general operation, it was intended, and could not fail, to excite resentment against Browne, the plaintiff, and compassion for Oswald, the ijLadant in the cause.
 

 He now proceeded to consider the mode of punishment, which formed a material part of Mr. Oswald’s complaint, and in support of its legality, referred, generally, to the authorities which he had already cited. He observed, that much declamation had been wasted upon this topic; and that the proceeding by attachment had been vehemently reprobated as the creature of the Star Chamber. Though that court might have employed the process of attachment (of which however he did not recollect an instance), yet, he insisted, that it was idle and absurd to consider it as the creature of a jurisdiction, whose own existence was of a much later date, than that of the subject to which we are told it gave birth. To prove this, he stated that the court of Star Chamber was not instituted until the year 1368, that
 
 Magna Gharta
 
 was confirmed, at least, 118 years before that time; and, as all the authorities concur in declaring that the process by attachment is as ancient as the laws themselves, and that it was confirmed by
 
 Magna
 
 Gharta, its origin is consequently long antecedent to that of the court of StaChamber. 4 Black. Com. 280, 281, 282, 283, 284, 285.
 

 But he argued, with great strength and perspicuity, that the process of attachment, which in practice was multiplied into innumerable uses, was essential to the administration of justice; and that if the exercise of this power was suppressed, the courts themselves might as well be annihilated. He represented, that it was an established principle in law', that one court could not punish a contempt committed against another, then, continued he, how shall the common pleas repel an injury of that nature? It is not vested 'with any criminal jurisdiction ; it cannot impannel a grand jury, nor try an indictment ; the only remedy, therefore, which the case can admit, is by an attachment. He applied the same reasoning to the supreme court; and with respect to the orphans’ court, the court of admiralty, and the courts .of the registers of wills, &c., he observed, that their proceedings, according to the civil law, w'ere totally independent of juries; and that, consequently, if they -were deprived of the process of attachment, it was in vain Cor them to decide and to decree, for they would then be without any means to enforce obedience to their decisions and decrees. Nay, he added, that, without this power, the legislature itself would be exposed to wanton insult and interruption;
 
 [1]
 
 and that letters, such as he had received, menacing his existence for his conduct on the present occasion, might be written and avowed with absolute impunity. He then enumerated many instances in which gross injustice would take place, but for the intervention of this summary proceeding. Where a sheriff refuses or neglects to return a writ; or to pay money which he has received upon an execution; where an inferior court refuses to transmit a record ; a witness or juryman to attend or to be sworn; and where a defendant in ejectment refuses to pay costs, after a nonsuit, for want of a confession of lease entry and ouster — in all these, and many other cases, he demonstrated, that the great, efficient remedy, was by an attachment to be issued against the delinquent.
 

 ' In tracing the antiquity of the process by attachment, he remarked, that it was admitted to be a part of the common law, by the most authoritative writers; and that the common law was a compound of the Danish, Saxon, Norman, Piet, and civil law. 1 Black. Com. 68. As, therefore, the attachment is derived from the civil law, and the civil law was introduced into England by the Romans, early in the first cer tury,
 
 [2]
 
 he
 
 *348
 
 thought it impracticable at this day to ascertain its source; but insisted, that enough appeared, to prove it to be of immemorial usage, and a part of the law of the land.
 

 He then adverted to the leading objection made by the advocates for Mr. Oswald, that, however the process of attachment might be legal in England, it was not so in Pennsylvania. From a decision in the time of Judge Kinsey, he showed, that, before the revolution, an attachment had issued for a contempt, and that the party had, in fact, answered certain interrogatories filed by order of the court; so that, it only remained to inquire whether any alteration had been introduced by the constitution of the state. In the 24th sect, of that instrument, it is declared, that, “ the supreme court, and the several courts of common pleas of this commonwealth shall, besides the powers usually exercised bjr such courts, have the powers of a court of chancery, so far as relates, &c.” Now, as it appears by the case which occurred while Mr. Kinsey was chief justice, that the power of issuing attachments was usually exercised by the supreme court, so far from altering the law, this is a direct confirmation of the jurisdiction of the court; for the greater naturally includes the less ; and if the court is vested with all its former powers, by what possible construction can we deprive it of this ? But it is answered, that a section in the bill of rights provides, that “in all prosecutions for criminal offences, the trial shall be by jury, &c.” True, but the whole system must be taken together ; or, if wo examine a particular part, it must be with a recollection of the immediate subject to which that part relates. For otherwise, this very section might as properly be brought to prove, that the judges could not bo impeached (since surely that is not a trial by jury), as thatthey have not the power of issuing attachments. All cases proper for a trial by jury, the bill of rights clearly meant to refer to that tribunal; but can anything more explicitly demonstrate, that the framers of the constitution were aware of some cases, which retired another mode of proceeding, than their declaration, that “trials shall be by jury as heretofore ?” — Who will assert that contempts wore ever so tried
 
 ?
 
 who will hazard an opinion, that it is possible so to try them ?
 

 But does not the constitution of Pennsjdvania further distinguish between the laws of the land, and the judgment of our peers ; furnishing a striking alternative, by the disjunctive particle
 
 or ?
 
 This very sentiment, expressed in the same words, appears in the
 
 Magna Ohao’ta
 
 of England; and yet Blackstone unequivocally informs us, that the process of attachment was confirmed by that celebrated instrument. In the 14 chap, of
 
 Magna Qliawta,
 
 it is also said, that “no amercement shall be assessed, but by lawful men of the vicinageand who, that is at all acquainted with the law, or with the reason of the law, can think it possible, in that case, to pursue the generality of the expression ?
 

 From these analogous principles, therefore, and the construction of ages, we may safely argue on the present occasion. But the wild and hypothetical interpretations which some men have offered, would inevitably involve us in a labyrinth of error, and eventually endanger that liberty, which they profess, and every honest citizen must wish, to preserve.
 

 As to the manner of proceeding upon the attachment, the court on this occasion have followed the precedent in Moseley’s Hep. 250, where it is liberally said, that the defendant shall not be permitted to be examined to bring himself into contempt; but upon proof of the contempt, he shall be allowed to purge himself upon his oath.
 

 ' Upon the whole, Mr.
 
 'Lewis
 
 concluded, that the only grounds of impeachment, were bribery, corruption, gross partiality, or wilful and arbitrary oppression; and that as none of these had been proved, Mr. Oswald’s memorial ought to be dismissed. He said, indeed, that it would be preferable to return to the state of nature, than to live in a state of society upon the terms which that memorial presented — terms, which left the weak and the innocent a prey to the powerful and the wicked; and which gave to falsehood and licentiousness, all that was due to freedom and to truth.
 

 When Mr.
 
 Lewis's
 
 argument was closed, Mr. Findley, a member from Westmoreland, rose, and delivered his sentiments, with great ability and precision. He acknowledged, that he had received great information and pleasure from the learned and eloquent
 
 *349
 
 speech of the member who preceded him; but he thought it was unnecessary, upon the present occasion, to explore the dark and distant periods of juridical history. The rights and immunities which formed the great object of the revolution, he contended, were capable of an easy and unequivocal definition; they were not of such remote antiquity as to be lost, even to the feelings of the popple; and the constitution of the state was the only proper criterion, by which they could be judged and ascertained. He did not, therefore, intend to pursue Mr.
 
 Lewis,
 
 in the track of legal disquisition ; but, appealing confidently to the instrument itself, ho deemed it to be his duty to pronounce, that the decision of the supreme court was a deviation from the spirit and the letter of the frame of government. In doing this, he observed, that ho did not mean to assert, that any ground had been shown for the impeachment of the judges. But on the contrary, he agreed with Mr.
 
 Lewis,
 
 that bribery, corruption, or a wilful and arbitrary infraction of the law, were the only true causes for instituting a prosecution of that nature; and his candor readily induced him to believe, that as none of these had been proved, neither did any of them actually exist on this occasion. But, he said, it was due to the dearest interests of posterity, that the legislature should act with that circumspection, should decide with that wisdom, which, leading on the one hand, to an acquittal of the judges, did not tend, on the other, to establish a baneful and destructive precedent. It was in this point of view, that the present proceeding presented itself to his mind, as a matter of the greatest magnitude and importance; and he said, it were better far that Mr. Oswald had suffered in silence and obscurity, than that the attention of the legislature should be awakened, only to give additional strength and authority to the mistaken judgment of the court.
 

 That it was a mistaken judgment, every man, he alleged, who possessed a competent share of common sense, and understood the rules of grammar, was able to determine, on a bare perusal of the bill of rights and constitution. With these aids, he defied all the sophistry of the schools and the jargon of the law, to pervert or corrupt the explicit language of the text; and therefore, he regretted, that in listening to the ingenuity of Mr,.
 
 Lewis's
 
 paraphrase, his admiration was not necessarily followed by conviction.
 

 He then discussed the 9th sect, of the bill of rights, which provides, “ that in all prosecutions for criminal offences, a man hath a right to be heard by himself and his counsel, to demand the cause and nature of his accusation, to be confronted with the witnesses, to call for evidence in his favor, and a speedy public trial, by an impartial jury of the country, without the unanimous consent of which jury, ho cannot be found guilty; nor can he be compelled to give evidence against himself; nor can any man be justly deprived of his liberty except by the laws of the land or the judgment of his peers.” He said, that in these expressions, there was nothing ambiguous or uncertain; they contained a recapitulation of the most valuable privileges, in the most positive language; and they did not require to be illustrated or explained, by the Roman institutions, or the British practice. Hither, he observed, every man could safely resort, in order to be taught the nature and extent of his rights and obligations; and it would be fatal, indeed, to the cause of liberty, if it'was once established, that the technical learning of a lawyer is necessary to comprehend the principles laid down in this great political compact between the people and their rulers. Even with respect to that clause on which the proceedings of the judges are particularly vindicated, he did not perceive a reasonable ground for the distinction that was attempted; but thought, with many other characters of superior information and abilities, that the law of the land was not, in fact, contra-distinguished from the judgment of his peers, but merely a diversity in the mode of expressing the same thing. He admitted, however, that cases did exist in which it was necessary, for the sake of justice, to empower the judges to exercise a summary authority. For outrages committed in the face of the court, for the misconduct of its officers, and for a disobedience or resistance of its process, there seemed, he said, to be a propriety in establishing an immediate remedy. But this did not extend, in his opinion, to the case of constructive contempts; to criminal offences perpetrated out of the view of the court; nor to such acts, as in their nature, did not call for a sudden punishment,
 
 *350
 
 and wh ich, in tl .eir operation, involved a variety of facts, that a jury was only competent to investigate a ad determine.
 

 With respect to the argument offered by Mr. Lewis, that at attachments had issued In Pennsylvania, before the revolution, and as the 24th sect, of the constitution declares, that the courts shall have all the powers which they usually exercised, therefore, the power of proceeding by attachment is confirmed, Mr.
 
 Mndley
 
 observed, that the fallacy of this interpretation would be notorious, by recollecting that the last sentence of that fery section stipulates, that such powers shall not be inconsistent with the constitution. JSior would he admit the inference which had been drawn from the next section, that says, “trials shall bo by jury as heretoforefor, he said, it appeared by its context and immediate subject, that it related to the-forms and modes of proceeding upon the trial, and not to the cases in which the trial ought to be allowed.
 

 Having expatiated, with great energy, upon the different points of the constitution, which the subject brought into view; having asserted the right of every man to publish nis sentiments on public proceedings ; and having urged the danger of permitting the judges, by implication, to punish for offences against themselves (observing, that if it «vas a contempt to write, it was also a contempt to speak of a cause depending in the courts), he concluded with intimating, that he should take an opportunity of submitting a resolution to the house, which might serve to avert the pernicious consequences of allowing the case of Mr. Oswald to grow into precedent.
 

 Mr. Fitzsimons, a member from the city of Philadelphia, now moved the following resolution:
 

 “Resolved, That this house having, in a committee of the whole, gone into a full examination of the charges exhibited by Eleazer Oswald, of arbitrary and oppressive proceedings in the justices of the supreme court against the said Eleazer Oswald, are of opinion, that the charges are unsupported by the testimony adduced, and, consequently, that there is no just cause for impeaching the said justices.”
 

 The proposition contained in this resolution, gave rise to a short but animated conversation. On the one hand, it was said, that in admitting that there was no ground of impeachment, it was not intended to concede, that the facts represented in the memorial had not been proved; and, on the other hand, it was answered, that, if there had been proof that the memorialist, according to the complaint, “ was immured in prison, without even the shadow of a trial, for an imaginary offence,” it would have been the indispensable duty of the legislature to vote for an' impeachment. A compromise, at length, took place, and the committee of the whole agreed to report the following resolution:
 

 “ Resolved, That the charges exhibited by Mr. Eleazer Oswald against the justices of the supreme court, and the testimony given in support of them, are not a sufficient ground for impeachment.”
 

 But when this report was called up for the decision of the house, it was postponed (and consequently lost), on motion of Mr.
 
 Ch/mer,
 
 in order to introduce the resolution originally proposed by Mr.
 
 Fitzsimons
 
 in the committee. Mr.
 
 Findley
 
 then claimed the attention of the members, and after a judicious introduction, presented the following resolutions to the chair, to supersede Mr.
 
 CVymer's
 
 motion:
 

 “ Resolved, That the proceedings of the supreme court against Mr. Eleazer Oswald, in punishing him by fine and imprisonment, at their discretion, for a constructive or implied contempt, not committed in the presence of the court, nor against any officer, or order thereof, but for writing and publishing, improperly or indecently, respecting a cause depending before the supreme court, and respecting some of the judges of said court, was an unconstitutional exercise of judicial power, and sets an alarming precedent of the most dangerous consequence, to the citizens of this commonwealth.
 

 “ Resolved, That it be specially recommended to the ensuing General Assembly, to define the nature and extent of contempts, and direct their punishment.”
 

 An interesting debate arose upon these resolutions, in the course of which, much that-had been said in the committee was repeated, and many new ideas were suggested, upon the general question of the jurisdiction of the court in cases of attachment. With respect to Mr.
 
 Findley's
 
 propositions, that gentleman ably supported them upon the spirit
 
 *351
 
 of the constitution, and the expediency of the thing itself. But it seemed to be satisfactorily answered by Mr.
 
 Lewis:
 
 1st, That the legislative power is confined to making the law, and cannot interfere in the interpretation; which is the natural and exclusive province of the judicial branch of the government; and 2d, That the recommendation to the succeeding assembly would be nugatory; for the courts of justice derive their powers from the constitution, a source paramount to the legislature; and, consequently, what is given to them by the former, cannot be taken from them by the latter.
 

 Mr.
 
 Findley's
 
 motions were lost, by a considerable majority ; and Mr.
 
 Glymer’
 
 revived resolution, adopted by the house: Yeas 34. Nays 23.
 

 [1]
 

 The case of Respublica
 
 v.
 
 Passmore led to an impeachment of the judges of the Supreme Court, ou which they were acquitted. See Trial of the Judges, which .ontains an. es-haustive review of the prior authorities ou thf question of contempts.
 

 [1]
 

 See Anderson
 
 v.
 
 Dunn, 6 Wheat. 204; Ex parte Nugent, 1 Am. L. J. 107; Kilbourn v. Thompson, 103 U. S. 168.
 

 [2]
 

 See Finlason’s Introduction to Reeves’ Hist, of the English Law.