## TENNEY'S CASE.

While a bill in equity was depending in court, containing serious charges against the respondents, Tenney, who was not a party to the bill, and had no interest in it, but who was interested in a suit brought by his son against one of the respondents, in which his son was unsuccessful, caused copies of the bill to be printed and extensively circulated among the persons with whom the respondents had business relations, saying that he would and could stop the proceedings in equity, if the respondents would pay him one thousand dollars, which was the sum he had lost in the law-suit. *Held*, that this conduct tended to obstruct the free course of justice, and was a contempt of court, and a rule was granted against Tenney to show cause why an attachment should not issue.

CONTEMPT. Motion for a rule to show cause why an attachment should not be granted.

On the twenty-second day of June, 1850, J. B. Curtis filed his bill in equity, in this court, against Joseph Low and Joseph A. Gilmore. The bill alleged that, in the month of December, 1842, Gilmore went into bankruptcy, and in the month of February, 1843, was declared a bankrupt; that in his application, he stated that Joseph Low was his creditor, for a sum exceeding $21.000, and in his inventory set forth, as part of his assets, claims against sundry persons, and effects, amounting to about $35.000; that Philip Greeley was appointed his assignee, and in the month of January, 1844, the district court ordered all the bankrupt's property to be sold at auction, including the claims above referred to, which were stated in the bankrupt's application to be deposited with Joseph Low. In the month of January, 1846, the property was sold to the orator, and conveyed to him by the assignee. In the month of February following, the orator's agent called on Low, and informed him of the sale, and requested him to render an account of his claim on the property, and deliver the property to the orator, on his paying the sum due Low. But Low refused to deliver the property, or render an account, but has delivered it, or much of it, to Gilmore, who has received and retains it, in fraud of the orator. Low admits

that, since the bankruptcy, he has delivered some of the property to Gilmore, but pretends that, at the time of the bankruptcy, Gilmore owed him for advances, services and expenses, and that he was liable for Gilmore in a large sum, which he was subsequently compelled to pay, and that for such liabilities, Gilmore pledged the property, with a power of sale ; that Low received the money on some of the claims and transferred the rest to Gilmore on receiving their value, and that he has not received more than enough to pay the debts due him from Gilmore, and the sums he has paid for Gilmore.

The bill then charges, that the notes from Gilmore to Low, were without consideration, and were made by collusion to defraud the creditors ; that nothing, or at most a very small sum, was due from Gilmore to Low ; that if Low was an endorser, or liable in any way for Gilmore, he was never legally bound to pay, and never did pay any considerable sum ; that for what he did pay he has been satisfied otherwise than by the avails of the property pledged ; that Gilmore, before his bankruptcy did not authorize Low to sell the property, and that it was given up by Low to Gilmore, for less than its value and with an intent to defraud. The bill then charges, that various inconsistent statements have been made, by Low and Gilmore, about the property, showing a fraudulent intent ; that Gilmore and Low, since the bankruptcy, have been in business as partners ; that John L. Whipple, whose notes are specified in Gilmore's inventory, is a brother-in-law of Gilmore, and a partner in the firm of R. F. Fletcher & Co., whose note is also specified, and that Low and Gilmore, colluding together, made such false statements to Greeley, the assignee, that he declined to redeem the property.

The bill prays for a discovery of the facts, and that an account may be taken of the sum due Low from Gilmore, upon payment of which, they shall be ordered to deliver the property to the orator.

Evidence was laid before the court from which the following facts appeared : At some period, prior to the filing of this bill, Gilmore commenced a suit against the respondent, Tenney, and attached certain cattle upon the writ. John P. Tenney, a son

of the respondent, then brought an action against the sheriff, on the ground that the cattle belonged to him, but the jury found a verdict for the defendant. In the month of May, or June, 1850, this respondent, Tenney, caused fifty copies of the bill in equity before mentioned, to be printed, and circulated them privately, not wishing to be known in the matter.

It appeared that he was aided in circulating the bill, by one David G. Fuller, who said that he had three thousand copies of the bill for circulation in the places where Gilmore had business connections, and wished the copies to be passed round for people to read. The respondent said that he had the control of the bill in equity, and that if Gilmore would pay him $1000, which was the sum he had lost by the cattle suit, he would get him clear from the bill in equity. He said to a Mr. Page, who was connected with Low and Gilmore, that he could ruin them all, and showed Mr. Page a certain writing which he threatened to publish, unless they would settle with him; and told Page, that if he would give up an execution, which Page held against his (Tenney's) son, for about five or six hundred dollars, costs in the cattle suit, he would do no more about it. He said he could make as much out of Low and Gilmore, as he had lost in that suit, and also gave Mr. Fowler to understand that Curtis purchased the demands against Gilmore, at the respondent's request, and said that he meant to get enough out of Gilmore to pay himself for his losses in the law-suit. There was also evidence that a copy of the bill was received by the minister of the church which Gilmore attended, and also at the office of the Merchants' Insurance Company, in Boston, where Gilmore had business. Curtis filed his affidavit, in which he stated that the bill was circulated without his direction, that Tenney had no authority to control the bill, and was not Curtis' agent, and that he endeavored to stop the circulation of the bill as soon as it came to his knowledge, and that no one was authorized to propose to Low and Gilmore any terms of adjustment, and that he was the only person interested in the bill in equity. Tenney stated in an affidavit, filed in the county of Belknap, for a continuance, this case being continued *nisi* to that county, that he did not

Tenney's Case.

consider himself the agent of Curtis, in the matter of the bill in equity.

*Bellows, Fowler,* and *Pierce & Minot,* for the motion.

GILCHRIST, C. J. The evidence submitted to us proves clearly, that Tenney had no authority to exercise any control over, or interfere in any way with, the bill in equity. There had been a controversy, between Gilmore and Tenney's son, concerning some cattle, and there was a trial which resulted in favor of Gilmore. This defeat seems to have rankled in Tenney's mind, and the evidence shows his determination to extract from Gilmore a sufficient sum to re-imburse him for the money he had been compelled to pay in that suit. The pendency of the bill in equity, against Low and Gilmore, afforded him, from the evidence, the opportunity he desired. The bill contained grave. and serious charges against the respondents, which, if supported by proof must injure, if not destroy their characters in the community, as good citizens and honest men, and whose immediate tendency, if circulated among those with whom they had business relations, must have been prejudicial. But, beyond this, it is to be considered that they had a suit pending in court. They had a right to an impartial trial. They were entitled to come into court with no prejudices of the witnesses or of the public, preexisting against them. The inevitable tendency of the circulation of such charges as those contained in the bill, was to create such prejudices; and if such things can be done with impunity, no one can be sure that his case will be treated with that impartiality which is the right of every citizen. What right had Tenney to interfere with a case to which he was not a party, and in which he had no interest? It is difficult to suppose that his motive was a good one; and a spirit of malevolence, coupled with a desire to extort money from Gilmore, seems, from the evidence, to have dictated his proceedings. That it is the duty of the court to frown upon such conduct, and to secure a faithful administration of justice, so far as is practicable, by punishing those engaged in such attempts, is not only the dictate of good judgment, but is the result of the authorities on this subject.

It is said by *Blackstone*, that the process of an attachment for a contempt, must necessarily be as ancient as the laws themselves. For laws without a competent authority to secure their administration from disobedience and contempt, must be vain and nugatory. A power, therefore, in the supreme courts of justice to suppress such attempts, by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every judicial tribunal. 4 Bl. Com., 286 ; *Yates* v. *Lansing*, 9 Johns. Rep., 416.

Among the matters considered as contempts, Blackstone enumerates " printing false accounts, or even true ones, without proper permission, of causes then depending in judgment." Abusing parties concerned in causes before the court of chancery, and prejudicing mankind before the cause is heard, is a contempt ; thus printing a brief before the cause was heard, was deemed a contempt in Captain *Parry's* case, as prejudicing the world with regard to the merits. 2 Atkyns' Rep., 469.

*Read* was ordered to be committed, and *Huggonson*, already a prisoner, to be taken into close custody, for printing reflections on the parties, in the case of *Roach* v. *Hall ; Ibid.*

Printing a paragraph in a newspaper, tending to prepossess the minds of people, as to the proceedings in this court, is a contempt. 2 Vesey, Sr., 520. In the case of *Respublica* v. *Oswald*, 1 Dall., 319, it was held that a publication, having a tendency to prejudice the public, with respect to the merits of a cause depending in court, was a contempt. Anything done, either for the purpose of obstructing justice, or which may have that effect, may be punished as a contempt of the court before whom the proceedings are had. *Holroyd, J.,* in *Rex* v. *Clement*, 4 B. & A., 233. The case of *Sittler* v. *Thompson*, 2 Beavan, 129, is much in point here. While proceedings were pending in the court of chancery, attacks on the plaintiff and his witnesses were published, representing those proceedings as vexatious, and that the witnesses had, in their evidence, been guilty of perjury. It was held, that this, being calculated to disturb the free course of justice, was a contempt of court, and the party in con-

tempt was ordered to pay all the costs of the proceedings against him.  No honest purpose could be subserved by publishing these charges to the world; by sending a bill, with such allegations, to the minister of Gilmore's church, and to the Merchants' Insurance Company, in Boston, and we have a right to presume that these copies were sent by Tenney.  The circulation of such charges, in the absence of proof, by a person unconnected with the questions to be tried, was dishonorable and vindictive in the highest degree, and an unwarrantable interference with the administration of justice.

*Rule granted.*