## AMERICAN SUMATRA TOBACCO CORPORATION v. SECURITIES AND EXCHANGE COMMISSION.

### Nos. 6776, 7372.

United States Court of Appeals for the District of Columbia.

Argued Nov. 8, 1939.

Decided Jan. 2, 1940.

Hugh H. Obear, of Washington, D. C., for petitioner.

Chester T. Lane, Gen. Counsel, Securities and Exchange Commission, Stuart K. Barnes, and Thomas J. Lynch, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice and MILLER and EDGERTON, Associate Justices.

GRONER, C. J.

Petitioner asked confidential treatment of a part of its profit and loss statement filed with the Commission.[1] Upon denial, it brought this petition for review.

Petitioner is a Delaware farmer-corporation engaged exclusively in growing, curing, and selling shade-grown wrapper tobacco for use in the manufacture of cigars. It owns and controls approximately 35,500 acres of farm lands in the States of Massachusetts, Connecticut, Georgia, and . Florida. It plants approximately 2,000 acres with tobacco each year—1,200 acres of "Type 61" are grown in the Connecticut Valley area; 800 acres of "Type 62" in the Georgia-Florida area. The remainder of the cultivated acreage is used for the company's cattle, horses, mules, and hogs, and the balance is wooded. The tobacco raised and sold by petitioner is divided into 21 grades, ranging in selling price from 15 cents to $5.00 a pound. It is sold exclusively to some eighty to ninety cigar manufacturers in the United States, and is used for cigar wrappers. Half its total crop is taken by as few as five or six, and more than three-fourths by about twenty purchaser-manufacturers. It produces approximately 20% of the shade-grown wrapper tobacco raised in the United States. Petitioner has about 2,000 stockholders, its stock is listed on the New York Stock Exchange, and since 1935 has been registered under the Securities Exchange Act of 1934.[2] Substantially all of petitioner's profits are derived from the sale of tobacco planted on the 2,000 acres.

Section 12(b) of the Securities Act of 1934, among other things, requires the registrant of securities to file with the exchange such information, in such detail, as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors, and specifically: "(1) * * * (J) profit and loss statements for not more than the three preceding fiscal years, certified if required by the rules and regulations of the Commission by independent public accountants * * *."

Section 13(a) requires the filing of information necessary to keep the registration statement current and also such annual reports as the Commission may by rule require.

The profit and loss statement prescribed by the Commission[3] requires the applicant to insert the proper figures showing:

| | |
|---|---|
| Gross Sales less Discounts, etc. | $........ |
| (Less) Cost of Goods Sold | $........ |
| Gross Profit | $........ |
| (Less) Expenses | $........ |
| Net Profit on Operations | $........ |
| (Plus) Other Income | $........ |
| Total Income | $........ |
| (Less) Other Charges | $........ |
| Net Income | $........ |

Petitioner concedes that normally a profit and loss statement should begin with the item of gross sales, and then show cost of goods sold and gross profits. Accordingly, petitioner's statements for the years 1935-6-7 contained the items, gross sales, cost of goods sold, and gross profits, with all the other information required under Forms 10 and 10K, but as to the particular items mentioned, petitioner requested confidential treatment in strict accord with Commission's Rule UB2 (now Rule X-24B-2). This rule provides that, when a registrant asks confidential treatment of any information furnished, the Commission will, upon request, grant a hearing, and that there will be no disclosure pending decision. In this respect, the rule does no more than carry into effect a privilege granted by Section 24(b) of the statute, which authorizes the filing of objections

[1] Securities Exchange Act of 1934, 48 Stat. 881: "Sec. 24(b). Any person filing any such application, report, or document may make written objection to the public disclosure of information contained therein, stating the grounds for such objection, and the Commission is authorized to hear objections in any such case where it deems it advisable. The Commission may, in such cases, make available to the public the information contained in any such application, report, or document only when in its judgment a disclosure of such information is in the public interest; and copies of information so made available may be furnished to any person at such reasonable charge and under such reasonable limitations as the Commission may prescribe." 15 U.S.C.A. § 78x(b).

[2] 48 Stat. 881, 15 U.S.C.A. § 78a et seq.

[3] Commission's Form 10 for registration, Form 10K for annual reports.

to the disclosure of information and authorizes the Commission to make such information generally available "only when in its judgment a disclosure * * * is in the public interest".

The case was referred, at petitioner's request, to an examiner. A large amount of oral testimony and documentary evidence was presented of which 703 printed pages are in the record. After oral argument, the Commission filed its "Findings and Opinion", covering 30 pages, and on February 1, 1939, issued an order denying confidential treatment. In the petition for review, petitioner assigns a number of reasons for setting aside the Commission's order, but in the argument and brief it confines itself to two points: (1) there is no substantial evidence to support the conclusion that it is in the public interest to require disclosure of the items of sales and cost of goods sold, and hence the conclusion is arbitrary and capricious; (2) the delegation by Congress to the Commission of the power to determine what shall or shall not be given confidential treatment under Section 24(b) of the Act is unconstitutional.

The Commission takes issue on both propositions, and this makes necessary an examination of the record.

The nearest thing to a definition of public interest in the Act is found in Section 2: "For the reasons hereinafter enumerated, transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to require appropriate reports, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions * * *."

 Judged by this statement of policy, it is clear that the Act contemplates publicity of corporate financial reports to insure the maintenance of fair dealing in the purchase and sale of securities not only for the benefit of the investing public, but as well for the protection of banks in which loans are collateralled by such securities. The provisions of Section 24, on the other hand, were, as we think, enacted to provide a means of avoiding the infliction of hardships· in particular cases where full disclosure would more likely result in harm to the registrant than in benefit to the public. ·Congress imposed on the Commission the duty of determining the question, and as we said in a former hearing in this case, this requires the exercise of a judicial discretion.[4] The Commission is correct, therefore, in saying that its duty is to weigh the respective equities. And this the Commission says is what it did.

Petitioner's request was, as we have seen, to deny publicity of that portion of its report showing the amount of gross sales and of the cost of goods sold. The deduction of the latter from the former gives the gross profit, and it was from this point that petitioner proposed to make its statement for public use. Its position is that disclosure of its gross profit margin, which in comparison with most other corporations is large, will engender strong customer resentment and impose damage and loss by creating a buyers' strike.

Petitioner assigns six reasons why this is true. Reasons 1 and 2 are that five or six customers purchase more than one-half of its entire output; that fewer than twenty purchase 85%; and that eighty or ninety embrace its entire customer list; that these customers are approximately the same year after year; that they are cigar manufacturers and carry large inventories of wrapper tobacco—in fact, two or three years' advance supplies; that forehanded with knowledge of the difference between petitioner's gross sales and cost of goods sold, they are in position to stay out of the market for one or two years and thus force down the price, to the ruin of petitioner's business without any corresponding benefit to either the investing public or the general public. Reasons 3, 4, 5, and 6 are that petitioner produces on an annual basis a single product which, once started, may not be stayed or retarded, a fact which would make it helpless in a buyers' strike. The evidence in the respects mentioned was summarized by petitioner's vice-president, as follows: "For the year ending

---

[4] 68 App.D.C. 77, 80, 93 F.2d 236, 239.

July 31, 1937, we had six customers who purchased 53.3 per cent of our total volume of sales. Those five or six customers or any two or any three of them, if they realized the percentage of profit that we are' making on our tobacco, could simply stay out of the market if we refused to sell them the tobacco at a lower rate of profit and we would be compelled to hold that tobacco and by growing another crop of tobacco in the .meantime, eventually would have to unload that tobacco at prices way under what we can sell it for if the customers don't have this information."

The Commission on its part denies that petitioner's fears are well-founded and insists that the disclosures of the figures in question will result in no injury of a character to justify exemption from the requirements of the Act. It suggests various factors which negative petitioner's contention of inevitable loss. It says, for instance, that buyers of leaf tobacco are not interested in profits of sellers but only in getting a fair price and, if petitioner's spread between gross sales and cost of goods sold is an incentive to that end, the buyer may now discover the average gross profit per. 'pound by calculation from production statistics available in the Department of Agriculture; and it further says that, even if the buyers should be inclined to beat down the price, petitioner is protected by the marketing agreement covering Type 61, and as to Type 62 by the crop control program administered by the Department of Agriculture, which is just another way of saying—by the inexorable law of supply and demand.

It will thus be easily seen that the petitioner and the Commission differ primarily not as to the facts, but rather as to the inferences to be drawn therefrom. The Commission insists that there is no danger of a buyers' "strike". Petitioner takes precisely the contrary view. No formula is furnished by either Commission or petitioner to determine the question. Both, doubtless, are sincere in urging the particular viewpoint, but obviously a certainly correct conclusion requires a degree of prevision which we cannot claim to possess.

What does appear is that the obvious purpose and intent of the Act is a full and complete disclosure of each registrant's financial condition, including a true statement of its profits and losses from time to time. The general principle underlying this requirement is. as apparent to the lay-

man as to the expert, and grows out of scandals resulting from past frequent manipulation of securities by the "insider", to the detriment of the investor. To correct these abuses, no one doubts, was in the public interest, and while nothing unfair or improper is imputed to petitioner, the question whether its case presents such positive equities as entitles it to be excepted from the general rule is, after all, the only question for decision.

This was recognized by Mr. Blough, the Commission's official expert, who frankly stated in his testimony that if public knowledge of the items in controversy would so seriously affect registrant as to wreck its business, disclosure should not be required. We are in accord with this view, and we think it correctly reflects the spirit of the Act. For unquestionably Congress, in giving a registrant the right to file objection to publication and in authorizing the Commission to grant or refuse the request in the exercise of a sound judicial discretion, imposed on the Commission the duty of considering the claimed danger of loss and damage and of weighing it in the scale of public interest. And this, at least, is what the Commission has attempted to do and, if the conclusion reached is just as likely to be correct as incorrect, it is our duty to let it stand.

In saying this, we can also say that we have no difficulty in understanding petitioner's reasons for apprehension that the disclosure will be harmful, and if the question were before us as an original proposition, we could easily see our way to sustaining the objections to general publication. But the question is primarily not for us but for the Commission, and Congress unquestionably intended that the Commission should bring to bear upon the decision of this and like questions, what has been called in cases within the jurisdiction of the Interstate Commerce Commission, the knowledge and experience of experts. This does not by any means set up an inquisition destructive of the rights of the individual. The delegated power is not to be exercised arbitrarily or to be considered an unfettered discretion over the property of the citizen. Its exercise is subject to review. But so long as the Commission's decision rests on substantial evidence and on inferences which are not arbitrary and capricious, it should be sustained. In the discharge by Congress of a dominant trust for the benefit of the

public, the possibility of incidental loss to the individual is sometimes unavoidable.

In this case the Commission has not justified its position on the ground of a general rule or a general policy. If it had, the case would have been different and would have demanded different treatment. The decision is placed on a fairer and broader ground. And, considered in that aspect and with due regard to all of petitioner's relevant evidence, which given its fullest significance still leaves the question in the realm of doubt and speculation, we do not feel justified in declaring the action of the Commission subject to correction.

This leaves for consideration petitioner's second point, that Section 24(b) of the Act delegates power without setting any standard for the Commission's action. Petitioner says the words "public interest" are too general to be a proper safeguard, but we think this point is without merit. The main purpose of the Act is to insure the maintenance of fair and honest markets in transactions in securities on national exchanges. The Act requires the issuer of securities—the registrant—to make disclosures in order to forestall unfair practices in the sale of securities and for the protection of investors. The "public interest" in this respect is just as definite as the "public interest" in transportation facilities. Powers of the Interstate Commerce Commission to make decisions, confined only by the latter standard, have been continually upheld. Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202; Intermountain Rate Cases, 234 U.S. 476, 34 S.Ct. 986, 58 L.Ed. 1408; Interstate Commerce Commission v. Goodrich T. Co., 224 U.S. 194, 32 S.Ct. 436, 56 L. Ed. 729; New York Cent. Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138. Considered in the light of the opinions in these cases, we think the Act provides a sufficient guide for administrative action whenever the Commission is called upon to decide whether or not disclosure is in the public interest.

Affirmed.