**FEDERAL TRADE COMMISSION et al.,**
Appellants,

v.

**CINDERELLA CAREER AND FINISH-
ING SCHOOLS, INC., et al.,**
Appellees.

No. 21118.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 27, 1967.

Decided March 12, 1968.

Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellants. Acting Asst. Atty. Gen. Carl Eardley, Messrs. David G. Bress, U. S. Atty., Alan S. Rosenthal and Harvey L. Zuckman, Attorneys, Department of Justice, were on the brief for appellant. Messrs. Morton Hollander, Attorney, Department of Justice, and Harold D. Rhynedance, Jr., Attorney, Federal Trade Commission, also entered appearances for appellants.

Mr. Alan Y. Cole, Washington, D. C., with whom Messrs. Herbert J. Gildenhorn and Harvey J. Rothberg, Washington, D. C., were on the brief, for appellees.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This case presents, precisely and concisely, the question whether the Federal Trade Commission is authorized to issue a factual news release concerning pending adjudicatory proceedings before it.

## I.

Appellee corporations operate and grant franchises for the operation of schools offering various courses in modeling, fashion merchandising, charm, and self-improvement. The individual appellee is the controlling stockholder of two of the corporations and the principal stockholder of the third appellee corporation.

Following an investigation, the appellant Federal Trade Commission, on February 13, 1967, issued a complaint (Docket No. 8729) against appellees, stating that the Commission, "having reason to believe" that the appellees had violated the Federal Trade Commission Act by engaging in unfair or deceptive practices and the use of false and misleading advertising in the operation of their business, was initiating a proceeding in respect thereto "in the public interest." Thereafter, the complaint enumerated the specific details constituting the charge and set forth quotations from the advertising alleged to be deceptive. The complaint identified the alleged falsities in the advertising, described the conduct claimed to constitute unfair or deceptive practices, and concluded with the customary allegation that the identified courses of conduct were in violation of section 5 of the Federal Trade Commission Act.[1]

This complaint was mailed to appellees on February 17, 1967. On February 20, 1967, appellees, "mindful and aware of the FTC's practice of issuing news releases and the adverse effects resulting therefrom," [2] petitioned the Commission to defer the issuance of any news release with respect to this proceeding, id est, Docket No. 8729, until after a final adjudication was had in the proceeding. On March 1, 1967, the Commission notified appellees that their petition had been denied, noting that the contents of the complaint which had been

1. 15 U.S.C. § 45 (1964).

2. Brief for Appellees at 6.

issued were in the public domain. The Commission furnished appellees at that time with a copy of the proposed news release and advised appellees that the news release would be issued on March 3.[3]

On March 2, the appellees commenced the present action by filing a complaint in the United States District Court for the District of Columbia in which they sought a restraining order against the issuance of the news release. The motion for the restraining order was denied by a District Court judge on March 2; and on March 3, the Commission promulgated a news release announcing and describing the issuance of the complaint against appellees. As a result, accounts of the complaint appeared in at least two Washington newspapers.

On March 22, 1967, appellees filed in the District Court an amended and supplemental complaint, seeking injunctive and declaratory relief against the Commission's issuance of further news releases with respect to the proceedings in Docket No. 8729 and requested the court to issue a preliminary injunction retraining any such action by the Commission. Appellees charged, in affidavits supporting the complaint, that the Commission's news releases resulted in cancellation of courses by students, inquiries from financial institutions and others with whom appellees were doing business and were generally harmful to appellees' business. On March 31, the Commission filed in the District Court a cross motion to dismiss the amended complaint.

At a hearing held in the District Court on April 13, 1967, the Commission's motion to dismiss the complaint was denied.

At the same time, the preliminary injunction requested by appellees was granted, and the Commission thereby was restrained from issuing any news release in Docket No. 8729 "until the Commission, after a full adjudication of the case, has issued either a cease and desist order or an order dismissing the Complaint, pending the final hearing and determination of this cause."[4] The District Court judge, in the findings of fact and conclusions of law supporting the injunction, found that the issuance of the news releases prior to final adjudication constituted, or gave the appearance of constituting, a prejudgment of the issues and that in the event of ultimate adjudication in appellees' favor by the Commission, the damage suffered by them through the news releases would be beyond "repair or remedy." The court also expressed "grave doubt" of the Commission's authority to issue the releases prior to final adjudication, found irreparable injury to appellees, and defined the Commission's duty in "quasi-judicial proceedings" to require the avoidance of prejudgment or the appearance of prejudgment.

The Commission seeks before this court to reverse the District Court's order enjoining the Commission's issuance of press releases and denying its motion to dismiss the complaint.

## II.

At the threshold of this case, we are confronted with the question of whether we have jurisdiction to consider the entire case on the merits or whether our review is confined at this time to the propriety of the issuance of the injunction. The pleadings before us are at best ambiguous as to whether the Commission

---

3. The issuance of the news release at this stage of the proceedings was in accord with the procedure and practice followed since 1918. This Commission's uniform practice is to issue press releases (1) at the time of filing of the complaint; (2) upon the filing of the respondent's answer (unless respondent requests otherwise); (3) upon the issuance of the hearing examiner's decision; and (4) up-

on the issuance of the Commission's final order. On occasion, the Commission issues press releases relating to interlocutory matters.

4. Cinderella Career and Finishing Schools, Inc. v. FTC, Civil Action No. 503–67 (D. D.C., Apr. 13, 1967). Joint Appendix at 109a.

has endeavored to appeal the denial by the District Court of its motion to dismiss the complaint. However, the teaching of Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), indicates that we do have the authority in a case involving an appeal as of right from the granting of an injunction to take note of the denial by the trial court of a motion to dismiss. While it is of course true that in *Deckert* there was no question but that the defendants had sought to appeal from the order denying the motion to dismiss as well as from the granting of an injunction, we feel, nevertheless, that the Court's language in that case minimizes the necessity of a purely formal appeal of an otherwise non-appealable order. We conclude, therefore, that we have the authority to dispose of the case on its merits and that sound judicial administration requires us to avoid any subsequent unnecessary proceedings in the District Court. Obviously, if we conclude that the motion to dismiss was improperly denied, the question of the propriety of the injunction is moot.

### III.

Congress, in 1914, enacted the Federal Trade Commission Act.[5] The then broad purpose of the Act was to prevent unfair methods of competition in their inception. Federal Trade Comm. v. Raladam Co., 316 U.S. 149, 162, 62 S.Ct. 966, 86 L.Ed. 1336 (1941). By the Wheeler-Lea amendment,[6] Congress, in 1938, broadened section 5 of the Act and extended the authority of the Commission to eliminate unfair or deceptive acts or practices in commerce without regard to competition. H.R.Rep.No.1613, 75th Cong., 1st Sess., 1, 3 (1937).

Section 5 of the Federal Trade Commission Act[7] provides, *inter alia,* as follows:

(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

\* \* \* \* \* \*

(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 227(a) of Title 7, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

Proceeding by Commission; modifying and setting aside orders

(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by

---

5. Pub.L.No. 203, ch. 311, 38 Stat. 717 (1914).

6. Pub.L.No. 447, ch. 49, 52 Stat. 111 (1938).

7. 15 U.S.C. § 45 (1964).

counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by sections 41–46 and 47–58 of this title, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. * * *

Section 6 of the Federal Trade Commission Act, 15 U.S.C. § 46, (1964) provides in pertinent part:

The Commission shall also have power—

Investigation of corporations

(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships.

* * * * * *

Publication of information; reports

(f) To make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

Section 1.132 of the Commission's General Procedures in effect when Docket No. 8729 was initiated, 16 C.F.R. § 1.-132 (1967) [8] included the following pertinent provisions:

Information in the following classes is public and may be obtained as indicated:

* * * * * *

(c) The decisions of the Commission in adjudicative proceedings and in proceedings disposed of by the entry of consent orders to cease and desist and texts or digests of selected advisory opinions are published periodically in official reports under the title "Federal Trade Commission Decisions."

* * * * * *

(e) The pleadings, transcript of testimony exhibits and all documents received in evidence or made a part of the record in adjudicative proceedings (except evidence received in camera) * * * are available at the principal office of the Commission for inspection and copying at reasonable times.

* * * * * *

(g) Additional information concerning the activities of the Commission is released from time to time through the Commission's Office of Information.

## IV.

The appellees, in their amended and supplemental complaint filed in the District Court, charged that while it has been the "uniform and long-established practice" of the Commission to issue news releases in its cases, the action, is unlawful because the Federal Trade Commission Act does not authorize such action by the Commission, violates the Due Process Clause of the Constitution, and constitutes an alignment, or appear-

8. The Commission's General Procedures were reorganized, effective July 1, 1967, and provisions substantially the same as subsections (c), (e) and (g) of section 1.132, quoted in the text, are now found in 16 C.F.R. § 4.9(d), (e) (4) and (e) (11), 32 Fed.Reg. 8458–9 (1967).

ance of an alignment, of the Commission "with the prosecution," resulting in a prejudgment (or appearance thereof) of the merits of a complaint prior to hearing. Appellees charged in paragraph 14 of their complaint that the Commission action resulted in irreparable damage to them since they, by the press release, "are subjected to public and business disrepute, scorn and obloquy; will lose and be deprived of economic opportunities; will suffer serious economic injury; and their continuing existence will be irreparably impaired."

We have no doubt that a press release of the kind herein involved results in a substantial tarnishing of the name, reputation, and status of the named respondent throughout the related business community as well as in the minds of some portion of the general public. Three hundred eighty-eight volumes ago, it was observed that "[w]here much has been said, something will be believed. * * " [9] We are confronted, then, not with the question of whether the appellees have suffered actual damage but whether the action of the Commission is so authorized or permitted in law as to place the appellees in the position of suffering *damnum absque injuria.*

■ Confronted in 1933 with the question of the Commission's right to hold an open or public session for the purpose of taking testimony on a complaint against the then appellant charging false and fraudulent advertising and unfair trade methods in commerce, we ruled unanimously that such proceedings were within the Commission's authority. E. Griffiths Hughes, Inc. v. FTC, 61 App.D.C. 386, 63 F.2d 362 (1933). The thrust of the District Court's order granting the injunction and denying the Commission's motion to dismiss is that while the adjudicatory proceedings before the Commission may be public they may not be the subject of a factual press release. Section 1.132 and successor sections 4.8 and 4.9 of the Commission's General Procedures, *supra,* make the pleadings, transcripts of testimony, documents, etc., matters of public record, open for public inspection by anyone interested in reviewing them and allow the release of additional information. These regulations, we hold, are a legal exercise of the Commission's discretionary authority, broadly conferred by subsection (f) of 15 U.S.C. § 46 (1964).

■ Proceeding, then, to consider whether the Commission may act affirmatively and on its own initiative in publicizing items relating to pending adjudicatory matters by releasing factual information from its own records, we turn, first of course, to the statute creating and empowering the Commission. By 15 U.S.C. § 45(a) (6) (1964), the Commission is "empowered and directed to prevent * * * unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." The Commission is required by 15 U.S.C. § 45(b) (1964), when it "shall have reason to believe" that a person or corporation has been, or is, using "any unfair method of competition or unfair or deceptive act or practice in commerce," and if in the Commission's judgment a proceeding in respect thereto "would be to the interest of the public," to issue a complaint, serve it on the respondent, and set a date for a hearing. The complaint (and any additional pleadings or orders) becomes, as heretofore pointed out, a matter of public record. That the basic purpose of the Act is the protection of the public is evident from the clause, "would be to the interest of the public," quoted above, and as emphasized at 15 U.S.C. § 46(f) (1964), *supra,* "as it shall deem expedient in the public interest." Indeed, court decisions hold, "[t]he purpose of the Federal Trade Commission Act is' to protect the public, not to punish a wrongdoer, * * * and it is in the public interest to stop a deception at its incipiency." Regina Corporation v. FTC, 322 F.2d 765, 768 (3d Cir. 1963), citing Gimbel Bros., Inc. v. FTC, 116 F.2d 578, 579 (2d Cir. 1941),

**9.** Respublica v. Oswald, 1 U.S. (1 Dall.) 319, 325, 1 L.Ed. 155 (1788).

and Progress Tailoring Co. v. FTC, 153 F.2d 103, 105 (7th Cir. 1946).

■ In defining the Commission's authority and responsibility in protecting the public interest, Congress specifically authorized the Commission "[t]o make public from time to time such portions of the information obtained by it hereunder * * * as it shall deem expedient in the public interest * * *." 15 U.S.C. § 46(f) (1964). We reject appellees' contention that this subsection is applicable only to the antitrust responsibilities of the Commission. We construe "hereunder" in the quoted phraseology as applying to the entire chapter 2 of Title 15 U.S.C., restricted of course by the specific limitations set forth in the chapter itself.

■ Since the Commission is charged by the broad delegation of power to it to eliminate unfair or deceptive business practices in the public interest, and since it is specifically authorized to make public information acquired by it, we conclude that there is in fact and law authority in the Commission, acting in the public interest, to alert the public to suspected violations of the law by factual press releases whenever the Commission shall have reason to believe that a respondent is engaged in activities made unlawful by the Act which have resulted in the initiation of action by the Commission. The press releases predicated upon official action of the Commission constitute a warning or caution to the public, the welfare of which the Commission is in these matters charged. We note that there is no contention in this case that the allegations in the Commission's complaint were knowingly false.[10]

We recognize that in legislating in the public interest and for the public welfare, Congress was acting to afford protection on a broad and comprehensive scale to millions of citizens residing and working at points far from the scene of Commission complaint, hearing, or other action. Moreover, "[t]he law is not made for experts but to protect the public,—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions." Aronberg v. FTC, 132 F.2d 165, 167 (7th Cir. 1942), citing Florence Manufacturing Co. v. Dowd, 178 F. 73 (2d Cir. 1910).

If the unsophisticated consumer is to be protected in any measure from deceptive or unfair practices, it is essential that he be informed in some manner as to the identity of those most likely to prey upon him utilizing such prohibited conduct. Certainly advice through news media as to the actions being taken by a government agency in his behalf constitutes a prophylactic step addressed ultimately to the elimination of the conduct prohibited by the statute.

The Commission, in attempting to bring its action relative to what it has reason to believe is unlawful conduct to the attention of the widely spread public by the issuance of factual press releases, is, we conclude, acting within its authority as defined by statute. In addition, we observe that Congress obviously has long been aware of and acquiesced in the Commission's press release procedures. See: 1962 FTC ANN.REP. 20; 1961 FTC ANN.REP. 20; 1956 FTC ANN. REP. 18; *Hearings before the Subcommittee on Independent Office Appropriations for 1960 of the House Appropriations Committee,* 86 Cong., 1st Sess. 109 (1959). Replies From Federal Agencies to Questionnaire Submitted by the Special Subcommittee on Governmental Information of the Committee on Government Operations, 84th Cong., 1st Sess. 207–221, Nov. 1, 1955.

10. We note also that the case does not involve 1) an allegation that the plaintiff was subjected to a discriminatory exercise of the Commission's authority to make news releases or 2) an allegation that the news release did not fairly and accurately summarize the Commission's complaint. We intimate no opinion as to the sufficiency of a complaint containing any of these three allegations. *See* B. C. Morton Int'l Corp. v. FDIC, 305 F.2d 692 (1st Cir. 1962).

## V.

Invoking a constitutional ground, the appellees, in the proceedings in the District Court, contended that the Commission has a duty in a quasi-judicial proceeding to avoid prejudgment, or giving the appearance of prejudgment, and that the press release program, by violating this duty, constitutes a violation of their due process rights. In substance, it was contended that the Commission, although it must ultimately pass judgment upon the merits of its complaint against the appellees, does, by the issuance of press releases appearing to support and justify its action, prejudge—or give the appearance of prejudging—the complaint before the respondents have been afforded a hearing. Declaring due process in an administrative hearing must meet the standards prescribed for criminal proceedings, the appellees conclude that "Due process requires that the accused receive a trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Pointing out that the Commission's press releases set forth to the public that the Commission has found "reason to believe" that the law has been violated, the appellees conclude that the Commission members are thereafter under a very real pressure to vindicate themselves and justify the charges to which the publicity has been given. "[A]gency members have a more active and affirmative commitment to achieving the goals and effectuating the policies declared by Congress; their success is measured by the agency's results in striving to obtain those positive objectives." Elman, A Note on Administrative Adjudication, 74 YALE L.J. 652, 653 (1965).

Congress has, as a general practice, vested administrative agencies with both the specified power to act in an accusatory capacity through the initiation of an action designed to enforce compliance with or prevent further violation of a statutory provision and with the responsibility of ultimately determining the merits of the charges so presented. In fact, this procedure is recognized by the Administrative Procedure Act, 5 U.S.C. § 500 (Supp. II, 1965–6), et seq. More specifically, while 5 U.S.C. § 554(d) (Supp. II, 1965–6) requires separation of the adjudicatory and prosecutorial functions in an agency, subpart (C) of subsection (d) excepts the "agency" or a "member or members of the body comprising the agency" from that requirement. The Federal Trade Commission's practice of reviewing the recommendations of subordinate investigative employees of the Commission and then making the decision to initiate a complaint is clearly within this exception to the Administrative Procedure Act. DAVIS ADMINISTRATIVE LAW, § 13.10, p. 242 (2d ed. 1959). "It is well settled that a combination of investigative and judicial functions within an agency does not violate due process. Belizaro v. Zimmerman, 200 F.2d 282 (3rd Cir., 1952); United States ex rel. Catalano v. Shaughnessy, 197 F.2d 65 (2nd Cir., 1952); Levers v. Berkshire, 159 F.2d 689 (10th Cir., 1947); Roccaforte v. Mulcahey, 169 F.Supp. 360 (D.C.Mass. 1958), aff'd. per curiam, 1 Cir., 262 F.2d 957; Brikley v. Hassig, 83 F.2d 351 (10th Cir., 1936); 2 Davis, Administrative Law Treatise, § 13.02. See, Federal Trade Comm. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948)." Pangburn v. CAB, 311 F.2d 349, 356 (1st Cir. 1962). While we are unwilling to go as far as the Fifth Circuit in declaring "the contention that the press release in some manner denied petitioner due process of law in that it prevented the Hearing Examiner and the Judicial Officer from acting fairly in the premises is frivolous,"[11] we conclude that the appellees have not been deprived of any due process right by the Commission's press release in this case.

## VI.

One further aspect of this case requires brief comment. As we have al-

11. Bowman v. United States Department of Agriculture, 363 F.2d 81, 86 (5th Cir. 1966).

ready noted, the practical effect of the Commission's initial press release, in this or any other complaint proceeding, is undoubtedly deleterious to the respondents' economic, business, and community status. Recognizing this result, the Commission, in this present proceeding and apparently in all subsequent similar cases, incorporated restrictive and cautionary phraseology in its press release. The second paragraph of the press release issued by the Commission on March 3, 1967 describing the complaint filed against appellees stated:

> (Note—A complaint is issued whenever the Commission has found "reason to believe" that the law has been violated and that a proceeding is in the public interest. It is emphasized that the issuance of a complaint simply marks the intiation of a formal proceeding in which the charges in the complaint will be ruled upon after a hearing and on the record. The issuance of a complaint does not indicate or reflect any adjudication of the matters charged.)

The quoted caution was well intended and is commendable. We have no doubt, however, that its practical value in minimizing the derogatory inferences upon the respondents' integrity was at best minimal, "for many will read the charge who may never see the answer * * *." Respublica v. Oswald, 1 U.S. (1 Dall.) 319, 324, 1 L.Ed. 155 (1788). We agree with the learned and experienced trial judge that "[i]n the event the final adjudication in Docket No. 8729 were to be in Plaintiffs' [appellees] favor, Plaintiffs would not be able to repair or remedy the damage suffered by them through the issuance and distribution of these news releases." [12] Unfortunate though this result may be, we are convinced that this damage does not constitute a transgression of the appellees' legal rights. In appraising a somewhat similar situation involving another government agency, we held that "[i]n the discharge by Congress of a dominant trust for the benefit of the public, the possibility of incidental loss to the individual is sometimes unavoidable." American Sumatra Tobacco Corporation v. SEC, 71 App.D.C. 259, 262–63, 110 F.2d 117, 120–21 (1940).

The action of the District Court in denying the Commission's motion to dismiss is reversed, and the case is remanded to that court with instructions to dismiss appellees' complaint.

Reversed.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge (concurring in the result):

Coupling the Federal Trade Commission's statutory call "to prevent * * * unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce" [1] with its statutory license "[t]o make public * * * such portions of the information obtained by it * * * as it shall deem expedient in the public interest," [2] the court finds "authority in the Commission, acting in the public interest, to alert the public to suspected violations of the law by factual press releases whenever the Commission shall have reason to believe that a respondent is engaged in activities made unlawful by the [Federal Trade Commission] Act which have resulted in the initiation of action by the Commission." [3] This, the court seems to hold, the Commission may do without prior hearing, with almost complete immunity from subsequent judicial alteration,[4] and irrespective of the magnitude of the injury to business relations

---

12. Cinderella Career and Finishing Schools, Inc. v. FTC, Civil Action No. 503–67 (D.D.C., Apr. 13, 1967), Joint Appendix at 107a.

1. Federal Trade Commission Act, as amended, § 5(a) (6), 15 U.S.C. § 45(a) (6).

2. Federal Trade Commission Act, as amended, § 6(f), 15 U.S.C. § 46(f), quoted more fully in the text at note 25, *infra*.

3. *Supra* p. 1314.

4. The only matters intimated by the court's opinion as possible subjects of judicial

inflicted thereby.[5] Since I concur less completely in the court's rationale than in the result it reaches in this case, I take this opportunity to state my views.

## I

When the Commission informed appellees of the denial of their request that no news release pertaining to the filing of the complaint be issued, it proffered this explanation: [6]

"The issuance of a complaint by the Federal Trade Commission is a matter of public interest. The fact that a complaint has been issued, as well as the contents of the complaint, are 'public information', within Section 1.132 [7] of the Commission's Rules of Practice. A complaint is a pleading in an adjudicative proceeding, and as such is not considered confidential, either as a matter of law or practice or for reasons of public policy. Since complaints fall within the category of public information, the objective of the Commission's Office of Information, in issuing factual news releases, is to provide a means whereby such public information is made available, simultaneously and on an orderly basis, to the bar, industry members, the press, and interested members of the public."

If my understanding of the court's opinion and the Commission's justifying statement is correct, they present diverging views as to what the Commission had in mind when it promulgated the release that precipitated this lawsuit. The court says the release was designed as a warning to that segment of the public with which appellees were or might be dealing.[8] The Commission, on the other hand, without any suggestion of so special or confined a purpose, tells us that the release was more broadly conceived as a vehicle facilitating dissemination to the public at large of newsworthy information already in the public domain.[9]

This difference I mention at the outset because it is fundamental in terms of the nature of the problem with which we are confronted. "The effective functioning of a free government like ours depends largely on the force of an informed public opinion." [10] Relatively few matters attract more readily the interest of the people than what government is doing for the people. News releasing by the agencies of government has become a standard technique in the operations by which the people are kept knowledgeable as to governmental affairs.[11] Press releases by public of-

inquiry are knowing falsity of the Commission's charging allegations, discrimination in its news releasing policies, and unfair or inaccurate sunmmarization of its complaint. See *supra* p. 1314 and note 10.

5. *Supra* pp. 1314, 1315–1316.

6. So far as the record discloses, this was the only statement by the Commission elucidating the basis upon which it made or contemplated any news release affecting appellees.

7. See the court's opinion *supra* p. 1312 at note 8.

8. *Supra* p. 1314.

9. This interpretation gains additional support from the Commission's general practice respecting the issuance of news releases in adjudicatory proceedings. Such releases are made not only when the complaint is filed, but also at several sub-

sequent points during the course of the proceeding, including the filing of an answer, the issuance of the hearing examiner's initial decision, and final adjudication by the Commission. This practice seems to accord more with a policy of informing the public as to what is going on before the Commission than with a policy of alerting the public to preferred but unadjudicated charges of conduct violative of the Act.

10. Barr v. Matteo, 360 U.S. 564, 577, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) (concurring opinion).

11. This is well known, and the widely used press release is no stranger to the judiciary. *See, e.g.,* Barr v. Matteo, *supra* note 10; Kukatush Mining Co. v. SEC, 114 U.S.App.D.C. 27, 29, 309 F.2d 647, 649 (1962); Glass v. Ickes, 73 App.D.C. 3, 117 F.2d 273, 132 A.L.R. 1328 (1940), cert. denied 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1941); Mellon v. Brewer,

ficials, we have said, "serve a useful if not essential role in the functioning of the democratic processes of government." [12]

An incidental and wholesome consequence of general publicity of proceedings challenging the fairness and honesty of particular commercial practices may well be the generation of a desirable if unnecessary measure of public caution in dealings with those identified with such practices.[13] Publicity, or the specter of publicity, may also, in a very practical way, achieve on its own a degree of informal regulation by deterring those who otherwise might be tempted to take liberties with the law.[14] But beyond these factors is the consideration that the business of an important governmental agency is everybody's business. The people want to know, and are entitled to know, what goes on in government,[15] and the thirst for information is not limited to those who may have or may contemplate a direct commercial relationship with the subject of governmental concern at the moment. The activities of the Federal Trade Commission constitute news, and any restriction upon its machinery for public accessibility to that news must be taken for what it really is.[16]

## II

We dealt with the public nature of the Commission's adjudicative proceedings in E. Griffiths Hughes, Inc. v. FTC.[17] There the Commission filed a complaint charging Hughes with unfair trade methods and false and fraudulent advertising. Hughes sought an injunction, in one respect quite similar to that which our appellees were awarded, "restraining the Commission from making the complaint public and from taking any testimony in public and from making public the transcript of the testimony." [18] Hughes alleged as the ground for injunctive relief, in much the same vein as our appellees did, "that, because of the announcements in trade journals of the issuance by the Commission of its complaint, appellant's business has been injured and that the taking of testimony in public will aggravate and increase the injury, * * " [19]

We noted that Hughes' case was "confined to the assertion that the Commission has no right to determine to hear evidence in public; that until its final determination its function is wholly in-

---

57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519, cert. denied 275 U.S. 530, 48 S.Ct. 28, 72 L.Ed. 409 (1927). See also the cases cited in notes 49 to 51, *infra*.

12. Glass v. Ickes, *supra* note 11, 73 App. D.C. at 8 n. 9, 117 F.2d at 278 n. 9.

13. Publicity focusing directly upon potentially harmful products or services is a method frequently employed to warn members of the public. See, e. g., Kukatush Mining Co. v. SEC and Glass v. Ickes, both *supra* note 11.

14. See Rouke, *Law Enforcement Through Publicity*, 24 U.Chi.L.Rev. 225 (1957). See also SEC v. Harrison, 80 F.Supp. 226, 229 (D.D.C.1948), appeal dismissed 87 U.S.App.D.C. 232, 184 F.2d 691 (1950), vacated 340 U.S. 908, 71 S.Ct. 290, 95 L.Ed. 656 (1951).

15. Cross, The Peoples' Right to Know 197–247 (1953).
   The so-called "Freedom of Information Act," Pub.L. 89–487, 80 Stat. 250 (1966), effective July 4, 1967, as incorporated by

Pub.L. 90–23, 81 Stat. 54 (1967) into 5 U.S.C. § 552, while not bearing directly on the issue presented in this case, evidences a clear congressional purpose to open the information possessed by federal administrative agencies to the general public on much the same basis that it is accessible to litigants in agency proceedings.

16. In passing on the propriety of the Commission's action here drawn into controversy, we are confined to the grounds the Commission invoked. See American Trucking Ass'n v. United States, 364 U.S. 1, 13–14, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960); Unemployment Compensation Comm. of Territory of Alaska v. Aragan, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

17. 61 App.D.C. 386, 63 F.2d 362 (1933).

18. *Id.* at 387, 63 F.2d at 363.

19. *Ibid.*

quisitional, and is therefore necessarily secret." [20] In response, we pointed to the Commission's rules opening to public inspection the papers in the case and specifying that hearings on complaints should be public,[21] provisions to which we affixed the stamp of our approval.[22] And, distinguishing the disclosure of information statutorily protected, we deemed legally innocuous the notoriety associated with pendency of the administrative proceeding:

> "Doubtless on such a hearing as is here provided the Commission has discretion, on a showing that such a hearing would disclose trade secrets or other data in itself destructive of the business under investigation, to do whatever is proper and necessary to avoid these consequences, but where, as is here alleged, the possibility of loss is founded wholly on the public knowledge that an investigation has been ordered, no good reason exists or can be shown why the public hearing should not continue." [23]

Our appellees do not press on so broad a front as did Hughes. They do not vie for sealed records or nonpublic hearings in the adjudicative proceeding. They do say that the Commission may not enhance the attendant publicity by a news release—a proposition promotive of rather curious results. Thus, while the papers on file in the proceeding constitute a public record, the Commission could not attract public attention to the record. While an enterprising reporter might flush out newsworthy information from the public docket, the Commission could not focus the attention of the press upon that information. And while individual citizens could, for informational purposes, themselves examine the Commission's public records and attend the public proceeding, the Commission could not assist affirmatively in the transmission of the same information to them through regular news channels. I turn now to consider whether the restriction for which appellees contend is required either by the Act or by the Constitution.

### III

The Act commands the Commission "[t]o gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of" unexempted corporations "engaged in commerce." [24] It also authorizes the Commission "[t]o make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest." [25] Its legislative history attests amply a congressional purpose to create an independent agency empowered not only to investigate and adjudicate, but also to convey the informational fruits of its labors to the American public.[26]

When this litigation was at the administrative level, the Commission had by rule classified as public information "[t]he pleadings, transcript of testimony, exhibits and all documents received in evidence or made a part of the record in adjudicative proceedings (ex-

---

20. *Ibid.*

21. *Ibid.* The rules operative when the Commission denied appellee's request were to the same effect. 16 C.F.R. §§ 1.132 (e), 3.16(a) (1967).

22. E. Griffiths Hughes, Inc. v. FTC, *supra* note 17, 61 App.D.C. at 387, 63 F.2d at 363.

23. *Id.* at 388, 63 F.2d at 364.

24. Federal Trade Commission Act, as amended, § 6(a), 15 U.S.C. § 46(a).

25. Federal Trade Commission Act, as amended, § 6(f), 15 U.S.C. § 46(f). My interpretation of this provision, like the court's *supra* pp. 1313–1314, is that it includes adjudicative proceedings. See United States v. Morton Salt Co., 338 U.S. 632, 649–651, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

26. See S.Rep.No. 597, 63rd Cong., 2d Sess. 11, 30 (1914); H.R.Rep.No. 533, 63rd Cong., 2d Sess. 2, 4, 8 (1914); H.R.Rep. No. 1142, 63rd Cong., 2d Sess. 18–19 (1914).

cept evidence received in camera)," [27] and had provided that "[a]dditional information concerning the activities of the Commission is released from time to time through the Commission's Office of Information." [28] For a half-century, the Commission had pursued a policy of issuing news releases upon the initiation of adjudicative proceedings and at important points during the course of such proceedings.[29] This consistent practice, involving as it does an administrative interpretation of the statute under which the Commission functions, is entitled to peculiar weight,[30] particularly where, as here, it has been made known to and acquiesced in by Congress.[31] I conclude that, all circumstances considered, the Commission is fully authorized to make available to news media, in the public interest, factually accurate summaries of significant developments in the adjudicative proceeding it instituted against appellees.[32]

Congress did not, however, confer upon the Commission an unqualified license to propagate the intelligence it garners in the course of its operations. Not only did it prohibit the disclosure of "trade secrets and trade names of customers" but, by providing for publication of "such portions of the information. * * * as it shall deem expedient in the public interest," it articulated two preconditions to divulgence of information of any other type. The first is a judicious exercise of administrative discretion preceding a resolve to publish,[33] a point underscored by the Act's legislative history.[34] The second, incorporated in the decisional standard provided, is expedience of the disclosure in the public interest.[35] Thus the propriety of an informational release to news media is not established necessarily and automatically by the institution of a complaint proceeding, albeit one directed toward alleged false advertising and deceptive commercial practices.[36] And both the discretional function and the Commission's determination in terms of the public interest clearly require adequate consideration and suit-

27. 16 C.F.R. § 1.132(e) (1967). See note 21, *supra*.

28. 16 C.F.R. § 1.132(g) (1967). See note 21, *supra*.

29. See the court's opinion *supra* p. 1310 at note 3.

30. See Udall v. Tallman, 380 U.S. 1, 11, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77. L.Ed. 796 (1933).

31. See Boesche v. Udall, 373 U.S. 472, 483, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 115, 59 S.Ct. 423, 83 L.Ed. 536 (1939); Massachusetts Mutual Life Insurance Co. v. United States, 288 U.S. 269, 273, 53 S.Ct. 337, 77 L.Ed. 739 (1933). See also the court's opinion, *supra* p. 1314.

32. The statutory authorization "[t]o make public * * * such information" clearly suffices. See Kukatush Mining Co. v. SEC, *supra* note 11, 114 U.S.App.D.C. at 30–31, 309 F.2d at 650–51.

33. See American Sumatra Tobacco Corp. v. SEC, 71 App.D.C. 259, 262, 110 F.2d 117, 120 (1940). See also E. Griffiths Hughes, Inc. v. FTC, *supra* note 17, 61 App.D.C. at 387, 63 F.2d at 363.

34. "All such investigations may hereafter be made upon the initiative of the commission, within constitutional limitations, and the information obtained may be made public entirely at the discretion of the commission." H.R.Rep.No. 533, 63rd Cong., 2d Sess. 3 (1914). And see note 26, *supra*.

35. See American Sumatra Tobacco Corp. v. SEC, *supra* note 33, 71 App.D.C. at 262–63, 110 F.2d at 120–121.

36. See R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 48–49, 299 F.2d 127, 131–32, cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); American Sumatra Tobacco Corp. v. SEC, *supra* note 33, 71 App.D.C. at 262–263, 110 F.2d at 120–121; American Sumatra Tobacco Corp. v. SEC, 68 App.D.C. 77, 80, 93 F.2d 236, 239 (1937); E. Griffiths Hughes, Inc. v. FTC, *supra* note 17, 61 App.D.C. at 388, 63 F.2d at 364.

able weighing of any damage to private property which widespread publicity of unadjudicated charges may be calculated to produce.[37]

I perceive no basis, however, on the record for interfering with the Commission's observance of its regular practice of periodic news releases during the course of the administrative proceeding against appellees. In justification of its decision to publicize the filing of the complaint, the Commission pointed to the fact that the public was interested in its adjudicative proceedings and to the further fact that the complaint it had filed was a public document.[38] The objective of this release, it said, "is to provide a means whereby such public information is made available, simultaneously and on an orderly basis, to the bar, industry members, the press, and interested members of the public." [39] This was, then, an administrative determination, in conformity with long standing policy, to facilitate the dissemination to the public through usual news media of news-

worthy information already open to the public. There is nothing in the record to suggest that substantially the same considerations did not underlie the Commission's proposal to issue additional releases as the proceeding progressed.[40]

There is no hint that the course the Commission contemplated was a manifestation of discrimination against appellees.[41] What the Commission wanted to do in this case it had been doing consistently and uniformly over a period of several decades in all adjudicative proceedings.[42] Nor is there any indication that the Commission at any time envisioned a press release that would be anything other than a fair, accurate summary of the developments imparting news value to the event to be reported.[43]

The record is skimpy as to some of the transpirations prior to the time appellees came to the District Court.[44] From what can be gleaned, however, there is no basis upon which it can fairly be held that the Commission was remiss in its statutory responsibilities.[45] Appellees

---

37. Compare American Sumatra Tobacco Corp. v. SEC, *supra* note 33, 71 App. D.C. at 260 n. 1, 261, 110 F.2d at 118 n. 1, 119, where considering a section providing that the agency "may, * * * make available to the public the information contained in" documents submitted by a registrant of securities "only when in its judgment a disclosure of such information is in the public interest," we viewed the section as "a means of avoiding the infliction of hardships in particular cases where full disclosure would more likely result in harm to the registrant than in benefit to the public." And see E. Griffiths Hughes, Inc. v. FTC, *supra* note 17, 61 App.D.C. at 387, 63 F.2d at 363, where, speaking to the fact that the Act does not specify that the Commission's adjudicatory hearings must be public, we pointed out that "[d]oubtless Congress considered that there might be occasions when it would be unjust to a person or corporation proceeded against to require public hearings and left the decision in such cases to the board." See also R. A. Holman & Co. v. SEC, *supra* note 36, 112 U.S.App.D.C. at 48–49, 299 F.2d at 131–132; Halsey, Stuart & Co. v.

Public Serv. Comm., 212 Wis. 184, 248 N. W. 458, 461 (1933). And see note 48, *infra.*

38. *Supra* p. 1317.

39. *Supra* p. 1317.

40. See the text *infra* at pp. 1321–1322.

41. *Cf.* B. C. Morton Int'l Corp. v. FDIC, 305 F.2d 692 (1st Cir. 1962).

42. See the court's opinion *supra* p. 1310 at note 3.

43. *Cf.* B. C. Morton Int'l Corp. v. FDIC, *supra* note 41.

44. This may have been an inevitable by-product of a decision by appellees to pitch the main battle in the judicial rather than the administrative arena. But see FCC v. Schreiber, 381 U.S. 279, 290–291, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

45. On the basis of the Commission's prior investigation it found "reason to believe" that appellees were in violation of the Act and, acting purportedly in "the interest of the public," it resolved to lodge a complaint. The investigation, as distin-

presented to the Commission a petition incorporating their grievance and their request, and presumably the facts they deemed to support it. The Commission, "[a]fter careful consideration" of the request in the light of specified public interest factors, found "no reason for deferring the issuance of an appropriate news release" concerning the filed complaint.[46] If I am to abide appellees' interpretation, implicit in their arguments here, that this evinced a Commission resolve to pursue its standard news releasing policy as to subsequent administrative developments, I must accept it also as an appraisement that, for simi-

lar reasons, the public interest would be served by doing so.

Congress committed the guardianship of the public interest to the Commission, and it was for it to make the determination which appellees later subjected to judicial scrutiny. Constitutional considerations aside, the Commission's action could properly be overturned only if it were beyond its statutory powers or if it were proven to be arbitrary.[47] I think the Commission had the necessary authority, and the record does not support a conclusion of arbitrariness.[48] Unless constitutionally infirm, that action should have been permitted to stand.

guished from the adjudicative proceeding on the complaint, was properly conducted *ex parte.* Bowles v. Baer, 142 F.2d 787, 788–789 (7th Cir. 1944); Woolley v. United States, 97 F.2d 258, 262 (9th Cir. 1938), cert. denied 305 U.S. 614, 59 S.Ct. 73, 83 L.Ed. 391 (1938); see also *Administrative Procedure Act,* § 6(b), 60 Stat. 240 (1946), 5 U.S.C. § 555(b), and no opportunity to contest the decision to bring the complaint was required. The preliminary determination implicit in "reason to believe" that the Act has been infringed is but the statutory prerequisite to the filing of the complaint which launches the adjudicative process. See Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 598, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). The effectuation of any forthcoming administrative order must await not only an administrative hearing on the charges made in the complaint but also any desired judicial review of the final administrative decision. "[N]o hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective." *Id.* at 598, 70 S.Ct. at 872. See also Kukatush Mining Corp. v. SEC, *supra* note 11, 114 U.S.App.D.C. at 30, 309 F.2d 650; R. A. Holman & Co. v. SEC, *supra* note 36, 112 U.S.App.D.C. at 47–48, 299 F.2d at 131–132.

46. With the explanation quoted *supra* p. 1317.

47. See American Sumatra Tobacco Corp. v. SEC, *supra* note 33, 71 App.D.C. at 262, 110 F.2d at 120; E. Griffiths Hughes, Inc. v. SEC, *supra* note 17, 61 App.D.C. at 387–388, 63 F.2d at 363–364. See also R. A. Holman & Co. v.

SEC, *supra* note 36, 112 U.S.App.D.C. at 49, 299 F.2d at 133.

48. Appellees' countervailing claim is of injury to their businesses by the publicity. While their petition is not in the record, I am willing to assume that they confided their apprehensions to the Commission and, by the same token, must assume that the Commission gave them due consideration, yet I would not conclude that the Commission's decision to make news releases was without rational foundation. The public interest in being informed of government business is strong. The pleadings and as well the proceeding remained open to the public. The Commission's proposal was to release information, not only upon initiation of the proceeding, but as the major events therein unfolded, irrespective of whom they favored. While private injury belongs on the scale when discretion is exercised, see note 37, *supra,* an administrative decision within legal bounds is not vitiated simply because such injury may follow. Ewing v. Mytinger & Casselberry, Inc., *supra* note 45, 339 U.S. at 599–600, 70 S.Ct. 870; Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 61–62, 59 S.Ct. 409, 83 L.Ed. 483 (1939); Kukatush Mining Corp. v. SEC, *supra* note 11, 114 U.S.App.D.C. at 31 n. 2, 309 F.2d at 651 n. 2; R. A. Holman & Co. v. SEC, *supra* note 36, 112 U.S.App.D.C. at 47–48, 299 F.2d at 131–132; American Sumatra Tobacco Corp. v. SEC, *supra* note 33, 71 App.D.C. at 262–263, 110 F.2d at 120–121; Heller Bros. Co. v. Lind, 66 App.D.C. 306, 307–308, 86 F.2d 862, 863–864 (1936). And see particularly E. Griffiths Hughes, Inc. v. F.T.C., *supra* note 17, 61 App.D.C. at 388, 63 F.2d at 364, quoted *supra* p. 1319.

## IV

Appellees' constitutional plea is an effort to equate Commission preparation of the prehearing news releases it dispenses with prejudgment of the administrative issues yet to be heard. It appears that all releases are cleared by a Commission attorney and the Commission's chairman, and are then distributed by the Commission's Office of Information. The gist of appellees' contention, which the District Court respected, is that such a release, once made, presents an insurmountable obstacle to objectivity.

This position lacks the support of judicial opinion. While occasionally, on particular facts, a predecisional release has been criticized for the outside appearances it created,[49] no case seems to reflect the view that the practice works a deprivation of due process, and the few cases addressing the question have held that it does not.[50] Still others have sustained such releases without allusion to due process,[51] apparently for lack of sufficient merit to induce presentation of the point or to entice its judicial treatment.

Like my colleagues, I am unpersuaded by appellees' argument, particularly as it must be related to the circumstances of this case. From all that appears, the only person with adjudicative responsibilities who performs any activity with reference to news releasing is the Commission's chairman, and he only checks proposed releases for accuracy. So minimal a participation in a strictly factual summary of pending charges hardly produces a subjective impact so inimical to fairness as to tender a due process issue.[52]

49. See N. Sims Organ & Co. v. SEC, 293 F.2d 78, 81 (2d Cir. 1961), cert. denied 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); Gilligan, Will & Co. v. SEC, 267 F.2d 461, 468–469 (2d Cir.), cert. denied 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

50. See N. Sims Organ & Co. v. SEC, supra note 49, 293 F.2d at 81; Bowman v. United States Dep't of Agriculture, 363 F.2d 81, 86 (5th Cir. 1966). See also Eastern Air Lines v. CAB, 271 F.2d 752, 757–758 (2d Cir. 1959), cert. denied 362 U.S. 970, 80 S.Ct. 954, 4 L.Ed.2d 901 (1960).

51. See, e. g., Kukatush Mining Corp. v. SEC, supra note 11. See also United States v. Diapulse Mfg. Corp., 262 F. Supp. 728 (D.Conn.1967).

52. Compare Eastern Air Lines v. CAB, supra note 50, 271 F.2d at 757–758. Nor can I accept appellees' theory, assuming its constitutional relevance, that the releases would be taken as external manifestations of prejudgments by the Commission. See the cases cited supra notes 50 and 51. Moreover, the press release the Commission succeeded in issuing displayed prominently this note:

"A complaint is issued whenever the Commission has found 'reason to believe' that the law has been violated and that a proceeding is in the public interest. It is emphasized that the issuance of a complaint simply marks the initiation of a formal proceeding in which the charges in the complaint will be ruled upon after a hearing and on the record. The issuance of a complaint does not indicate or reflect any adjudication of the matters charged."

The Commission tells us that its present practice is to incorporate such a notice in all news releases.