## City of Philadelphia v. Cuneo Eastern Press, Inc.

*Peter Hearn*, for appellant.

*Kenneth Cooper*, Assistant City Solicitor, contra. contra.

HIRSH, J., April 15, 1974.—Appellant conducts a large scale printing operation in Philadelphia. On April 11, 1972, appellee, Department of Public Health Air Management Services, issued an administrative order requiring, inter alia, that appellant bring its operations into compliance with the Air Management Code by January 10, 1974, and submit progress reports by certain dates as set forth in said order. Thereafter, on April 2, 1973, an amended order was issued stating that appellant was a source of air contaminants and, as such, was in violation of the Air Management Code and Air Management Regulations I, II and V. Appellant was required to minimize emissions by September 1, 1973, and to comply with the Air Management Code by January 1, 1975. Appellant appealed said amended

order to the health commissioner, and on May 3, 1973, an administrative hearing was held. The amended order was affirmed and appellant presently appeals to this court.

This court's scope of review of decisions of the Department of Public Health and Air Management Services is limited by the Local Agency Law of December 2, 1968, P. L. 1133, 53 PS §11308, to questions of appellant's constitutional rights, errors of law, procedural irregularities, and lack of substantial evidence to support the findings of the administrative agency: Harrington v. Philadelphia Civil Service Commission, 4 Comm. Ct. 580, 287 A. 2d 912 (1972). Therefore, because of this limited scope of review, this court cannot substitute its opinions for those of the administrative agency but must only decide whether the agency acted capriciously, in bad faith, without substantial evidence, or in abuse of its powers. Here appellant argues that this court should reverse the decision of the Department of Public Health and Air Management Services because it did not have substantial evidence to support its findings and appellant's constitutional right to due process of law was violated.

The criteria for "substantial evidence" has often been stated. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and more is required than a mere scintilla of evidence or suspicion of the existence of a fact to be established": Bortz Coal Company v. Commonwealth, 2 Comm. Ct. 441, 456 (1971). It is the contention of appellant that the order of appellee fails to meet this burden. However, this court cannot substitute its judgment for that of the administrative agency with respect to the weight of the evidence (Urbach Unemployment Compensation Case, 169 Pa. Superior Ct. 569, 573 (1951)); the agency is the sole judge of the weight of

the evidence: Hamilton Unemployment Compensation Case, 181 Pa. Superior Ct. 113, 119 (1956).

Specifically, appellant contends that the evidence presented is insufficient to support the beliefs that (1) "low solvent" inks are or shortly will be on the commercial market, and (2) alternative methods of compliance are available to appellant. Hugh S. Fitch, Manager of Product Planning for Inmont Corporation, testified as to the possible availability of "low solvent" ink.

"Q. (By Mr. Hearn) With respect to the solvent level of inks which would be sold to a printer such as Cuneo —by that I mean a letter press printer—would you describe what research and development has occurred in the recent past and what the state of the art is at the present time?

"A. (By Mr. Fitch) We have for some time been working on inks of all types—but in this particular case letter press—in an effort to reduce the hydrocarbon content. Some efforts have been made to reduce it to zero, and we do have such ink systems.

"Q. What has been the recent development and what is the present state of the art with respect to a thirty percent level of solvent in these inks?

"A. We believe we can provide inks of thirty percent or less.

"Q. (By Mr. Hearn) Describe now the other tests at letter press operations.

"A. (By Mr. Fitch) There was an earlier trial at Cuneo with a slightly different type of ink system which was reasonably successful. It was I believe monitored. The visible emission was reported to have been one or less on the Ringlemann scale. The print quality was judged to be fair. The comments were made as to the strengths of the inks and perhaps some adjustment of body but by and large the inks were reasonably successful. These inks were low solvent

inks, but they were not down to the thirty percent level. We have since that time been able to bring these down to thirty percent or lower.

"Q. (By Mr. Hearn) What is the state of your present belief as to whether you can make an ink which could be used successfully up to the publisher's standard on a letter press such as Cuneo has?

"A. (By Mr. Fitch) I believe that we can supply such an ink. However I am not certain of that until we have further trials.

"Q. (By Mr. Hearn) Are there any inks which are presently commercially available to a letter press printer like Cuneo which can meet the fifteen pounds per day standard contained in Regulation V in your opinion?

"A. (By Mr. Fitch) There is one system.

"Q. Would you describe that?

"A. This is known as ultraviolet curing system. It contains no solvent and has no effluent at all. It is 100% solid system.

"Q. So therefore it has no hydrocarbon?

"A. No hydrocarbon.

"Q. —to throw into the air.

"A. Right.

"Q. (By Mr. Donlevie) The September 1 deadline you state was not reasonable in terms of getting the solvent level down to thirty percent, is that correct?

"A. (By Mr. Fitch) That isn't what I meant; perhaps that is the way it came out. We have formulas now which contain thirty percent or less solvent. The formulas are established and will be the formulas which we will provide Cuneo for the tests. What will cause the delay is the scaling up all the way along the line—I mean from pilot varnish kettle up to our large kettles . . .

"Q. What would be a reasonable date?

"A. If you would like an opinion from me as to what I think would be a reasonable time, I would say maybe November 1 would be a reasonable date.

"Q. Do I understand you to say that if you ignore the cost factor there are at least two other systems which could be engineered to result in compliance—that is after-burners or the ultraviolet method?

"A. They are not only feasible but they're in daily use."

In light of the foregoing testimony, this court cannot agree with appellant's contentions.

Appellant further argues that economic factors should be considered in the instant matter. Although this court is deeply moved by appellant's contention, we nevertheless are greatly concerned for the express legislative intent and purpose of the Philadelphia Air Management Code, to wit: more effective control over pollution is necessary to eliminate air contaminants from Philadelphia. Judge Kramer in Bortz Coal Company v. Commonwealth, supra, discussed the role of the courts in enforcing the acts of the legislature and the regulations promulgated thereunder:

"In spite of the fact that this writer may believe that the disappearance of a large recognized industry in this State will be a socio-economic tragedy for thousands of citizens of this Commonwealth, this Court cannot pass upon the advisability of such an economic occurrence. That determination has been made by the Legislature, and this Court can do nothing but follow the mandates of that body."

Testimony relating to economic impact was considered at the hearing, and it is not proper for this court to substitute its judgment for that of the administrative agency.

Lastly, appellant urges that since William Reilly, Acting Assistant Health Commissioner, had the dual

function of hearing objections to the order herein and also supervising the preparation of said disputed order, appellant was deprived of his right to due process of law. Appellant argues with authority that it is patently unfair for an individual to judge a case which he helped prosecute. In those cases relied upon by appellant, one individual possessed both the adjudicatory as well as the prosecutory functions. However, in the instant action, Mr. Reilly acted solely as the judge. Although he knew the content of the order prior to its issuance, approved its form, had an opinion as to its reasonableness, and was cognizant of the case's factual background, Mr. Reilly's actions were passive and not prosecutory. "It is well settled that a combination of investigative and judicial functions within an agency does not violate due process": F. T. C. v. Cinderella Career and Finishing Schools, Inc., 131 U.S. App. D.C. 331, 404 F. 2d 1308 (1st Cir. 1968). Moreover, there has been no showing of bias or prejudice. In order to overturn the determination of a hearing examiner, the Court in Converse v. Udall and Independent Quicksilver Co. v. Udall, 262 F. Supp. 583, 590 (1966), stated that it is necessary to require a substantial showing of bias to disqualify a hearing officer in administrative proceedings or to justify a ruling that the hearing was unfair (United States ex rel. De Luca v. O'Rourke, 213 F. 2d 759, 763 (8th Cir. 1954)), and it has been held that the bias and prejudice alleged must be "personal" and that a mere prejudgment of the case is not sufficient: Marquette Cement Manufacturing Co. v. F. T. C., 147 F. 2d 589, 592 (7th Cir. 1945).

Accordingly, it is therefore ordered and decreed that the decision of the Department of Public Health, Air Management Services, City of Philadelphia, is affirmed, and the appeal is dismissed.